COURT OF APPEALS OF VIRGINIA

Present:   Judges Russell, Ortiz and Raphael
Argued at Richmond, Virginia

CARL ALLGE WILKINS

v.       Record No. 0715-21-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE WESLEY G. RUSSELL, JR.
MAY 24, 2022

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Frederick G. Rockwell, III, Judge

Stephen K. Armstrong (Armstrong Law LLC, on brief), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Carl Allge Wilkins was convicted by a jury of second-degree murder, in violation of

Code § 18.2-32.  Wilkins challenges the sufficiency of the evidence to sustain his conviction.  He

also argues that the trial court erred by not striking the testimony of a witness.  For the reasons

that follow, we affirm the judgment of the trial court.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  We

accordingly discard any of Wilkins' conflicting evidence, and regard as true all credible evidence

favorable to the Commonwealth and all inferences that may reasonably be drawn from that

evidence.  *Gerald*, 295 Va. at 473.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

On February 10, 2020, Wilkins called 911 at 11:29 p.m. and reported a stabbing at an apartment. The 911 operator told Wilkins to stay on the line and to place the victim "flat on his back on the floor." Wilkins acknowledged the operator's instruction, and replied "Yes, yes" when the operator asked if Wilkins was laying down the victim. The operator asked if Wilkins was controlling the bleeding, and Wilkins replied, "I can't, I don't know what happened." When the operator asked if the knife was still there, Wilkins replied, "No, I don't know what he did with it" and "They ran off." The operator emphatically told Wilkins to "lay him flat on his back now" and asked Wilkins to let him know when he had done so. The operator again asked if the victim was flat on his back, and Wilkins replied that he had "tried to." Wilkins did not reply to the operator's additional questions, and the call ended after about four minutes.

Chesterfield County Police Officers Schilke and Bechtold arrived at the apartment and found the victim, later identified as Jamar Golightly, lying on his right side and chest with his face down on the porch. Blood covered the front and back of his shirt and was smeared on various parts of the front door, frame, and threshold of the apartment. Golightly was pronounced dead at 11:37 p.m.

As officers searched the area, they discovered a trail of blood leading from the location of the victim to the steps of Wilkins' apartment, located two units away; blood also was pooling on top of a trash can outside. Inside Wilkins' apartment, officers discovered blood on the kitchen floor, on the kitchen wall beside the back door, on a chair in the living room, on a coat that was on the chair, and on the wall between the kitchen and the living room. The coat had been cut numerous times. Officers also found blood on the front porch pillar at the apartment in between Wilkins' apartment and the apartment where Golightly was found. No forensic analysis was performed on any of the blood.

Officers eventually located and arrested Wilkins late the next day at Erica Thierry's house in Henrico County. Wilkins had cuts on the index finger, thumb, and palm of his right hand but otherwise was uninjured. Wilkins told the police that when he and Golightly went back outside after returning from a liquor store, "three people in all black" confronted them and started swinging knives. Wilkins tried to "block" the knives and sustained three cuts on his right hand. Wilkins claimed that after the attackers fled, Golightly "ran" inside through the back door, out of the "front door," and then "to the next apartment." Wilkins claimed that he pursued Golightly and called 911 because he "was bleeding on the porch." He said that he had tried to help Golightly by applying pressure but "there was nothing" he could do to stop the bleeding.

At Wilkins' trial, Thierry testified that on the night of the incident, she arrived at Wilkins' apartment around 9:00 p.m. She drove Wilkins and Golightly to a liquor store and then to a convenience store before returning to Wilkins' apartment. She parked in the rear, and they entered through the back door. They went into the living room, where Thierry and Wilkins sat on a couch and Golightly sat in a chair next to Wilkins. At one point in the evening, Thierry saw Wilkins with a knife.

According to Thierry, Wilkins and Golightly were "drinking and smoking" and went into the kitchen three times to argue. Thierry could not see them or hear what was said when they were in the kitchen but could tell they were arguing. She heard them walk out the back door when they were in the kitchen for the third time. Two minutes later, Golightly came inside and had blood on the front and back of his shirt. Golightly sat in the chair and said, "Call 911," but Thierry did not make the call.

About a minute later, Wilkins came inside and asked Thierry, "You know what happened, don't you?" Golightly ran out the front door, but Wilkins "chased" after him. Thierry followed the men outside and saw Golightly fall and not "get up." Wilkins told Golightly to "get up" and called

911 when he did not respond. Thierry did not see Wilkins bend over or try to stop the bleeding with his hands. When emergency vehicles reached the next street, Wilkins and Thierry left, walking "quickly" back through the apartment to get to her car.

Thierry drove Wilkins to her house in Henrico County. At her house, Wilkins kept "looking out the window" "[a] whole bunch of times" to see if the police were coming. He also changed into "a jacket and a t-shirt and jeans" belonging to Thierry's son but kept his own shoes. The next morning, Thierry drove Wilkins to a picnic area south of Petersburg, where Wilkins put a bag of "[h]is clothes" in a trash can and set it on fire. That night, police arrested Wilkins at Thierry's house; his shoes had "red stains" on them but the clothing he was wearing did not. A search of the house uncovered a "bloody sock" and a "utility knife."

At various points during Thierry's testimony, counsel and the trial court indicated that they could not hear her and asked her to "speak up" and to speak into the microphone. Wilkins' counsel asked Thierry if she could be mistaken about seeing Wilkins with a knife, reminding her that she had testified at the preliminary hearing that she had not seen a knife in his hand. Thierry replied that she was not mistaken and explained that she "wasn't saying a lot" at the preliminary hearing. Thierry acknowledged that she initially did not tell the police that Wilkins had a knife, explaining that she "didn't tell the cops everything the first time I talked to them" because she had been worried about getting into trouble.

Wilkins moved the trial court to strike Thierry's testimony after cross-examination. He argued that the jury didn't hear "half of what she said" and that her testimony was not "that helpful in general because of the inability to hear what she was saying." After argument by counsel, the trial court denied the motion to strike her testimony, emphasizing that Wilkins could argue to the jury that "they can consider her demeanor on the stand, her presentation, whether they find her credible."

- 4 -

Golightly's girlfriend, KeMaya Lewis, testified that, on the night Golightly died, she talked to him after 9:00, while he, Wilkins, and Thierry were at the store. Golightly's phone's battery began to run low, and he told Lewis he would call her once he could charge it. About 7:00 the next morning, Lewis called Golightly's phone but received no answer, so she called Wilkins. Wilkins replied via text message and said that "somebody killed" Golightly. Wilkins informed Lewis that he and Golightly were getting out of the car when they were "ambushed" by men swinging knives. When Lewis replied that it did not make sense, Wilkins said that he thought somebody had been watching them. Wilkins also told Lewis that he had called the police, then went to Williamsburg.

Wilkins' next-door neighbor, Destiny Joyner, testified that she heard a "loud" "[c]ommotion" coming from Wilkins' apartment about 11:30 p.m. on the night Golightly was killed. Shortly afterwards, someone knocked on her front door, but she did not answer. Cynthia Moriconi, who lived in another complex behind Wilkins' apartment, went outside to smoke around 11:15 p.m. After a few minutes, she heard an "altercation" between two people. When she heard "a scream" from the direction of Wilkins' apartment, she looked and saw "a silhouette of a person at the top of the steps" of Wilkins' back porch. The person walked down the steps and towards the trash can in Wilkins' backyard. Moriconi did not see anyone else or any moving cars; she went back inside just before 11:30 p.m.

Dr. Jeffrey Gofton, an assistant chief medical examiner, performed an autopsy on Golightly, who suffered ten stab wounds: two in the head, four in the torso, and two in each arm. Although the wounds were mostly superficial, one on the outside left area of Golightly's chest extended "four and a half to five inches deep" and "passed through the left lung and penetrated into the heart." That wound caused "extensive internal bleeding," and would have made it difficult for Golightly to breathe, ultimately leading to his death by "bleeding" and "compression of the lung." Gofton did not find "defensive wounds" on Golightly's hands, although there was "some blood smear" on

- 5 -

them, and found no injuries on the fingers, which he described as "not consistent" with having been in a fight. After looking at photos of the injuries to Wilkins' hands, Gofton testified they appeared to be cuts rather than stab wounds. Gofton could neither exclude nor confirm that Golightly's wounds were caused by more than one knife.

Wilkins moved to strike the evidence, arguing that Thierry was "completely incredible" and "unreliable" and that the evidence was circumstantial. Wilkins also argued that there could have been more than one knife involved, the Commonwealth had not proved that the blood found belonged only to Golightly, and no evidence showed Wilkins' DNA on Golightly. Finally, Wilkins argued that the evidence contradicted Thierry's statements to police. The trial court denied the motion to strike.

Wilkins testified that he and the victim had not argued inside the apartment. According to Wilkins, as they stood on the back porch smoking, three men "wearing all black" suddenly appeared and, without saying anything, started "swinging knives." Wilkins tried to block a knife swing and suffered cuts on his hand. Golightly was closer to the attackers, so Wilkins "grabbed [him] and pulled him . . . into the house." Wilkins claimed that neither he nor Golightly descended the steps during the attack and could not explain why blood was on the trash can. After Wilkins and Golightly were in the house, Golightly "ran out" the front door to "get away from" the attackers, and Wilkins followed to "see if he was okay." Wilkins admitted that Golightly was safe inside the house and could not give a reason why Golightly would have gone outside where the attackers were. Wilkins did not remember Golightly sitting in the chair or taking off the jacket that was found on the chair.

According to Wilkins, after running out the front door, Golightly knocked on the door of the apartment next door, and when no one answered, went to the apartment next to that one, knocked on that door, and "collapsed." Wilkins claimed that he called 911 and "turned [Golightly] on his back"

as the 911 operator instructed. Wilkins testified that Golightly "died in [his] arms" and that, when he was arrested, he was wearing the same clothes he had on the night of the incident. Wilkins claimed that he did not remain at the scene because he "had so much going on," including a capias for his arrest on other charges, and "didn't want to get locked up." Wilkins testified that he "pressed on [Golightly's] chest" to stop the bleeding, but "[t]here was no response."

At the close of all the evidence, Wilkins renewed his motion to strike the evidence. The trial court denied the motion. After closing argument by counsel, the jury convicted Wilkins of second-degree murder.

This appeal followed.

ANALYSIS

I. Standard of review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Our review of a challenge to a trial court's decision to admit evidence is governed by the principle that "'the admissibility of evidence is within the discretion of the trial court' and an appellate court will not reject the decision of the trial court unless it finds an abuse of discretion." *Hicks v. Commonwealth*, 60 Va. App. 237, 244 (2012) (quoting *Midkiff v. Commonwealth*, 280 Va. 216, 219 (2010)). "Under this deferential standard, a 'trial judge's ruling will not be reversed simply because an appellate court disagrees;' only in those cases where 'reasonable jurists could not differ' has an abuse of discretion occurred." *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

## II. Sufficiency of the evidence

In his first and third assignments of error, Wilkins challenges the sufficiency of the evidence to sustain his conviction. First, he asserts that the evidence failed to prove that he was the perpetrator. He maintains that Dr. Gofton's opinion that he could not exclude the possibility that Golightly's wounds were caused by more than one knife supports his claim that there were multiple attackers. He also emphasizes that no forensic evidence demonstrated whose blood was smeared on the porch or that his own DNA was on Golightly. Wilkins next maintains that the key evidence—Thierry's testimony—was "incredible" and "unreliable." He contends that much of her testimony was too garbled or quiet to be understood, that she may have been impaired on the stand due to mental or substance abuse issues, and that she testified inconsistently with prior statements. We consider each argument in turn.

### A. Identity

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element

- 8 -

of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

Moreover, "[t]he 'reasonable hypothesis of innocence' concept is . . . well defined." *Kelley*, 69 Va. App. at 629. "[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Case v. Commonwealth*, 63 Va. App. 14, 23 (2014) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). Further, the Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson v. Commonwealth*, 281 Va. 212, 217-18 (2011). "Whether [a] hypothesis of innocence is reasonable is itself a 'question of fact' subject to deferential appellate review." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (citations omitted). That a "defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). Accordingly, "[w]hen examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a

rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *White v. Commonwealth*, 68 Va. App. 241, 252 (2017) (quoting *Vasquez*, 291 Va. at 250).

The evidence demonstrated that Wilkins, Golightly, and Thierry were together inside Wilkins' apartment on the night of Golightly's death. Thierry saw Wilkins with a knife and heard him and Golightly walk out the back door while arguing. Two minutes later, Golightly reentered the house with multiple stab wounds and covered in blood. Golightly asked Thierry to call 911; when she did not and Wilkins came back into the apartment, Golightly fled and knocked on neighboring doors before collapsing on a porch. Although Wilkins claimed that Golightly was fleeing from his attackers by running out the front door, the jury reasonably could infer that Golightly left the apartment because his attacker—Wilkins—had followed him inside. *See Person v. Commonwealth*, 60 Va. App. 549, 555 (2012) (noting that "[jurors] may make use of their reason and common sense, and the knowledge and experience gained by them in everyday life" (alteration in original) (quoting Charles E. Friend, *The Law of Evidence in Virginia* § 19-20 (6th ed. 2003))).

Additionally, it is well established that "[a] defendant's false statements are probative to show he is trying to conceal his guilt, and thus [are] evidence of his guilt." *Taylor v. Commonwealth*, 61 Va. App. 13, 31 (2012) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 548 (1991)). Here, Wilkins testified extensively in his defense, but his testimony was inconsistent with his earlier statements and was contradicted by the bulk of the Commonwealth's evidence. Although Wilkins claimed that he and Golightly were attacked by three unknown assailants who got out of a car, Moriconi was outside and heard an altercation between two people and "a scream" coming from Wilkins' apartment at the time of the incident. Notably, she saw only one man on the porch after the scream, not multiple people or any moving cars as

- 10 -

Wilkins claimed. Wilkins also claimed that he turned Golightly onto his back after the attack and tried to stop the bleeding, but the responding officers found Golightly face down and Thierry did not see Wilkins bend over Golightly or observe him trying to stop Golightly's bleeding. Furthermore, Wilkins' testimony that neither he nor Golightly descended the back steps and that Golightly ran through the house and out the front door without sitting in the chair was contradicted by the blood found on the chair's arm rest, on the porch steps, and on the trash can. Given the above circumstances, the jury, as the factfinder, "was at liberty to discount [Wilkins'] self-serving statements as little more than lying to 'conceal his guilt,' and could treat such prevarications as affirmative evidence of guilt." *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (internal citation omitted).

Finally, the record demonstrated that Wilkins fled the scene before officers arrived. Then, after reaching Thierry's house and changing his clothes, he drove to a park south of Petersburg and burned his bloody clothing in a trash can. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "[E]vidence of flight may be considered as evidence of guilt along with other pertinent facts and circumstances." *Hope v. Commonwealth*, 10 Va. App. 381, 386 (1990) (*en banc*); *see Jones v. Commonwealth*, 279 Va. 52, 58 (2010) (recognizing that flight from the scene of a crime may be considered in the context of other facts as evidence tending to show a defendant's consciousness of guilt). Although Wilkins claimed that his flight was due to an outstanding capias, the jury reasonably could infer that he fled because he was conscious of his guilt in killing Golightly. *See Ricks v. Commonwealth*, 39 Va. App. 330, 337 (2002) (holding that when a defendant's "flight might have been attributable to several causes, consciousness of guilt c[an] be inferred . . . if any one of those causes was the instant offense").

## B. Credibility

Notwithstanding the above, Wilkins maintains that Thierry's testimony was inherently incredible. It is well established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley*, 69 Va. App. at 626. Instead, such inconsistencies are appropriately weighed and "'resolved by the fact finder,' not the appellate court." *Id.* (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)).

Moreover, "[t]he power to segregate a witness's testimony into the believable, partly believable, or wholly unbelievable is an exercise of decisional discretion intrinsic to the factfinding task and essential to its proper performance." *Harper v. Commonwealth*, 49 Va. App. 517, 523 (2007). "When 'credibility issues have been resolved by the jury in favor of

the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler*, 59 Va. App. at 291 (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

Thierry's testimony is not incredible as a matter of law. Although the record demonstrates that Thierry was frequently difficult to understand while testifying, the effect of a witness's demeanor is a matter to be decided by the factfinder. *See Turner v. Commonwealth*, 63 Va. App. 401, 409 (2014) (holding that "the manner" of a witness's testimony "goes to its weight, not its admissibility"). Similarly, a witness's delay in reporting details of an incident does "not render [her] testimony inherently incredible as a matter of law." *Corvin*, 13 Va. App. at 299. Instead, the jury is entitled to attribute "such significance as it deem[s] appropriate" to such circumstances. *Id.*

In addition, a witness's testimony is not inherently incredible when it has been corroborated by other evidence. *Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019). Joyner and Moriconi both testified that they heard a commotion occurring at Wilkins' apartment between 11:15 and 11:30 p.m., corroborating Thierry's testimony that Wilkins and Golightly argued. Additionally, evidence demonstrates that Golightly sat in the chair after being stabbed, that he left the apartment and knocked on the door of the adjacent apartment, and that he knocked on the door of the next apartment before collapsing on that apartment's porch; such evidence supports Thierry's testimony of what occurred in the apartment. The record also demonstrates that Golightly was not on his back when officers arrived, corroborating Thierry's testimony that she did not see Wilkins bending over or assisting Golightly after he fell. Finally, the record demonstrates that when arrested, Wilkins was wearing clothes that did not have blood on them, except his shoes, supporting Thierry's testimony that Wilkins, while at her house, changed into "a jacket and a t-shirt and jeans" but kept his own shoes.

In sum, Thierry was not incredible as a matter of law. Accordingly, the Commonwealth's evidence was competent, not inherently incredible, and sufficient to support Wilkins' conviction.

### III. Admission of Thierry's testimony

Wilkins argues that the trial court erred by not striking Thierry's testimony because the "garbled" nature of her testimony produced "extreme and repeated difficulties in both hearing and understanding" her. He emphasizes that she also was asked "specifics as to her mental health status as well as possible substance use and abuse while on the stand."

As noted above, "the admissibility of evidence is within the discretion of the trial court[,]" and we "will not reject the decision of the trial court unless it finds an abuse of discretion." *Hicks*, 60 Va. App. at 244 (quoting *Midkiff*, 280 Va. at 219). The record does not establish that the trial court abused its discretion in refusing to strike Thierry's testimony. Nothing in the record establishes that the jury could not understand or hear Thierry; no juror raised the issue with the trial court or indicated in any way that Thierry was inaudible or incomprehensible. The court reporter transcribed the testimony, and Wilkins has never objected to the transcript or voiced any concern that it is not an accurate transcription of Thierry's testimony. Thus, although she was asked to speak up on multiple occasions, the record does not establish that the jury or others ultimately did not hear what Thierry had to say.

Similarly, there is no evidence to suggest that mental health issues or substance abuse precluded Thierry from being a competent witness. Although Wilkins points to questions she was asked regarding her potential use of substances that may have affected her abilities as a witness, Thierry's answers not only do not support a finding of impairment, they negate one as she denied using any substances before her appearance at trial. Because the evidence before the trial court does not even suggest that there were substance abuse or mental health issues that

- 14 -

interfered with Thierry's ability to testify, the trial court did not err in refusing to strike her testimony.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*