UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Humphreys and Friedman
Argued at Lexington, Virginia


ANTONIO TQUAN TERRY, S/K/A
  ANTONIO T-QUAN TERRY
                                              MEMORANDUM OPINION* BY
v.        Record No. 0187-21-3                JUDGE FRANK K. FRIEDMAN
                                              DECEMBER 13, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Paul C. Galanides for appellant.

John Beamer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial Antonio TQuan Terry ("Terry") was convicted of first-degree

murder, use of a firearm in the commission of a felony, and five counts of maliciously shooting

into an occupied vehicle.  He was sentenced to forty-five years of incarceration.

He argues on appeal that the circuit court erred in denying his motion to set aside the

verdict.  His motion to set aside alleged that one of the jurors answered questions falsely on voir

dire regarding her relationship to the victim and to the Commonwealth's key witness.  For the

following reasons, we affirm.

<u>Background</u>

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(2016)). This Court must reject any of appellant's evidence that conflicts with that of the Commonwealth, and instead "regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* at 473 (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)).

<u>Jury Trial Proceedings</u>

The evidence presented during the jury trial established that Terry traveled in a vehicle with two other men on July 25, 2019; Keenan Cunningham was driving the vehicle and Lateze Barnes and Terry were passengers. The testimony at trial established that Cunningham stopped to let both Barnes and Terry out of the car just after 3:30 a.m. However, Cunningham was found shortly after by an officer in the vicinity; he was dead, sitting in the same vehicle, just down the street from where the passengers had been dropped off. Cunningham had bullet wounds and .9-millimeter shell casings were found near the crashed vehicle.

The police investigated Terry, who admitted to detectives that he had been with Cunningham the previous night but was dropped off before Cunningham's car crashed. Terry was subsequently charged with several crimes in relation to Cunningham's death.

Barnes was a witness for the Commonwealth at trial. He had been friends with both Terry and Cunningham for about fifteen years before the murder. He testified that the three men had gone together to a casino in North Carolina the night before. On the way home to Danville, Terry began arguing with Cunningham about Cunningham's reckless driving. Barnes explained there hadn't been bad blood or pre-existing arguments between the friends, but on that night, Terry had been asking to get out of the car—because of Cunningham's dangerous and fast driving—but Cunningham would not let him out. During the trip home Terry told Cunningham that his driving had put Terry's life in danger. Eventually, Cunningham did pull over and let Barnes and Terry out at an unintended destination—Hughes Street. Barnes exited the vehicle

- 2 -

from the rear passenger side, and Terry exited from the front passenger seat. Barnes heard shots that were close and also on the right side of the car. After hearing the shots, he ran. He glanced back and saw flames on the right side of the car, heard gunshots, saw the flashes of gunfire going toward the car, and saw Terry still to the right of the car. Barnes testified that he had not seen a gun, had not seen Terry with a gun that night, and guns were not allowed in the casino they were returning from. Barnes took himself to the Danville police station the next day after hearing the police were looking for him.

The Commonwealth called fourteen witnesses to testify in addition to Barnes. Mostly, they were police or forensic workers that were not present during the shooting. The officers and forensic testimony established that shots were fired into the vehicle from a .9-millimeter gun and that Terry was in the area of the murder around 3:30 a.m. based on phone records. However, a witness named Tomekia Barnes was an eyewitness to some of the events. She testified that she lived on Hughes Street and knew Terry prior to this incident. The night of the murder, she was walking between apartments looking for a cigarette. She saw a vehicle pull over and heard two car doors open. She did not see who got out of the front passenger seat, but she did hear and see what looked like a shooting before seeing someone take off running. She did not see who did the shooting, but she saw someone wearing a white t-shirt that "looked like [Terry]." The next day Terry came by her apartment several times. On at least one occasion, he asked her about what she told the police. She asked him where the gun was from the night before, to which he replied he did not have a gun the night before. Tomekia explained that she knew Terry owned what might have been a .9-millimeter gun, which she had seen him with before this incident.

The jury returned a verdict finding Terry guilty of first-degree murder, use of a firearm in the commission of a felony, and five counts of maliciously shooting into an occupied vehicle. It sentenced Terry to forty-five years.

The court indicated it would impose the jury's sentence. Prior to entry of the court's sentence Terry moved to set aside the verdict and requested a new trial. He argued that one of the jurors, Angela Flowers, knew Barnes, a key witness, and Cunningham, the victim, but was dishonest about the relationships during voir dire. The court held a hearing on this motion prior to entering a sentencing order.

## Voir Dire Proceedings

During the pre-trial venire of the jury, the circuit court gave general directions to the jurors about venire. It explained "if the court finds that it would be inappropriate for a particular juror to serve on this case for a specific reason, such as a juror being related to one of the parties, or a victim then that juror would be excused from service as a juror in this case." Following general instructions, the court asked the jurors "[d]oes anyone know, or is anyone related by blood or marriage, or have any relationship that you know of with Mr. Terry?" to which no juror responded, including Flowers. When asked if any member of the jury knew Cunningham, two jurors responded that they did; each of these two jurors was asked if they could be fair and impartial, to which they said no. Both jurors were then excused.[1] Flowers did not respond in any manner to the question about Cunningham. Flowers did not respond affirmatively when the Commonwealth asked the jury whether anyone knew Barnes, nor did she respond affirmatively when the jurors were asked whether there was any reason they could not give a fair and impartial trial to both sides.

## Post-Trial Motions to Set Aside the Verdict and to Grant a New Trial

Following the trial, social media evidence linking Flowers and Cunningham was discovered by Terry's mother, who knew Flowers' mother, but not Flowers. A Facebook post

---

[1] The questions about knowing Terry and Cunningham were repeated three additional times as other jurors were replaced based on various responses.

from Flowers read "Rip Kalosso Keenan there was never a dull moment when we was at primos, you always had me crying laughing." Kalosso Keenan was the name Cunningham used on Facebook.

During the hearing on Terry's post-trial supplemental motion to set aside the verdict, Terry argued that Flowers provided a false answer during jury selection regarding her knowledge of Barnes and Cunningham. He alleged that she allowed her knowledge of Barnes to affect her credibility determination of the Commonwealth's witness, and her lack of candor regarding her knowledge of Cunningham proved she was not indifferent in the case, resulting in injustice to Terry.

Flowers testified about her knowledge of and relationship with Terry, Cunningham, and Barnes during the post-trial hearing. Carlos Torrain, a man who knew all three men, testified as well. Terry and Terry's mother also testified about the relationships between Flowers, Terry, Barnes, and Cunningham.

<u>Flowers' Relationship with Barnes, the Commonwealth's Key Witness</u>

Torrain, who was thirty-two years old at the time of his testimony, explained that Barnes and Flowers had known each other during their childhood and he had seen them interact a few times fifteen or sixteen years prior. When they interacted those few times, they were just "chilling" and "coming out of high school."

Flowers testified that she knew Barnes as a child and they were maybe cousins, but she had not seen him since she was a child and did not even know he lived around her. She had not been in touch with him since childhood. She did not know if they were actually biologically related, or if so, how "far down the line" their relationship went. She did not recognize him by name at trial because she knew him simply as "Teze," rather than as Lateze Barnes. Once she actually saw him at trial, she recognized him.

- 5 -

<u>Flowers' Relationship with Cunningham, the Victim</u>

Torrain said that he grew up knowing Barnes, Flowers, and Cunningham, and though Barnes came around to the apartment complex where he and Flowers lived, he never saw Cunningham in the complex.

Flowers testified that she did not recognize Cunningham by his name either (she knew him as Kalosso Keenan, his Facebook name). She only realized she knew him when she recognized him from a photograph shown during the trial.

Flowers testified that she had known Cunningham for about two weeks, when they both worked as delivery drivers for an Italian restaurant, Primos, about four years prior to the trial. She remained Facebook friends with Cunningham but said they never spoke or kept in touch after that two-week period. She saw on Facebook that he died (and wasn't informed by anyone specifically). When she heard he died she never looked up any information about his death.

<u>Flowers' Relationship with Terry[2]</u>

During the hearing, Terry testified he did not know Flowers and had never talked to her in his life.

Flowers testified that they grew up near each other, so she knew of him, but their interactions were limited to "maybe say[ing] hey." It had been a while since she had seen him. She mentioned knowing his name, but she did not know him "very well," only "in passing."

---

[2] In his motion and supplemental motion to set aside the verdict, Terry does not raise any allegation that Flowers' impartiality was affected by her knowledge of Terry—however, Terry did testify at the hearing. Also, in Terry's brief he mentioned that Flowers "admitted knowing [Terry] as well . . ." and argued that Flowers "offered absolutely no explanation for why she did not immediately acknowledge her prior contacts with the Appellant."

<u>Flowers' Explanation of Her Failure to Disclose these Connections and the Circuit Court's Ruling Finding that Flowers Did Not Intentionally Misrepresent Her Responses and that Flowers was Credible and Unbiased</u>

Flowers admitted that she did not say anything when she realized she knew Cunningham. Flowers explained that she didn't say anything about knowing any of the men she recognized because it would not have anything to do with whether Terry was "right or wrong"—this was based on the questions she had seen the judge ask the jurors who knew Cunningham during voir dire. She clarified that she knew to base her decision on just the truth and that her decision in deliberation was based only on the evidence, the law, and what she observed during trial. She agreed that by the time she went back to deliberate, she realized she knew the people involved. However, she testified that this knowledge "didn't affect anything cause I didn't know any of the [sic] personally [sic], like close wise. Like, we spoke, talked, conversate so I based on it on what I seen, what they showed us . . . the videos, the evidence."

The circuit court found that Flowers was "very credible." It could "understand" Flowers not recalling the knowledge given the time frame involved. Though it found the Facebook post troublesome, it noted she adequately explained her confusion given that she knew Cunningham for just a two-week period two years before his death and four years before trial. It found that she did not "intentionally misrepresent her responses." The court "accept[ed] as true her testimony that she was not biased [and found] the defense [did not] demonstrate[] that she would have been struck."

Accordingly, the judge denied the motion to set aside. This appeal followed.

Analysis

A.   Standard of Review

"It is well settled that the credibility of witnesses [and] the weight accorded witnesses' testimony . . . are matters that are within the province of the fact finder." *Perez v.*

- 7 -

*Commonwealth*, 40 Va. App. 648, 655 (2003) (citing *Brown v. Commonwealth*, 25 Va. App. 171, 192 (1997)). "The existence of an individual juror's possible bias or partiality is a question of fact to be determined by the trial court." *Id.* (citing *Watkins v. Commonwealth*, 229 Va. 469, 480 (1985)). "An appellate court must give deference to a trial court's factual finding regarding a juror's impartiality because the trial court 'sees and hears the juror.'" *Blevins v. Commonwealth*, 267 Va. 291, 297 (2004) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)). The trial court is in "a superior position to determine whether a prospective juror's responses . . . indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011) (quoting *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005)). Therefore, a trial court's finding with respect to juror impartiality will be reversed "only upon a showing of manifest error." *Blevins*, 267 Va. at 297 (citing *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)); *see Skilling v. United States*, 561 U.S. 358, 396 (2010) ("A trial court's finding of impartiality may be overturned only for manifest error."); *Goodwin v. Commonwealth*, 71 Va. App. 125, 136 (2019) ("Juror impartiality is a question of fact [which] must be affirmed unless it is plainly wrong or without evidence to support it.").

## B. Constitutional Guarantee of an Impartial Jury

Terry challenges the circuit court's finding—that Flowers did not intentionally answer incorrectly—as "plainly wrong." Terry's argument is steeped in his constitutional right to an impartial jury.

Voir dire allows the parties to examine possible biases in potential jurors, and truthful answers are necessary in the process of impaneling an impartial jury. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). "Demonstrated bias in the responses to

questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." *Id.*

"The right to be tried by an impartial jury is guaranteed under both the United States and Virginia Constitutions." *Taylor v. Commonwealth*, 61 Va. App. 13, 22 (2012) (citing *Swanson v. Commonwealth*, 18 Va. App. 182, 184 (1994)). This constitutional guarantee is reflected in Virginia statutes and the Rules of the Supreme Court of Virginia. Code § 19.2-262.01; Code § 8.01-358; Rule 3A:14.

A Virginia statute gives parties the right to ask each juror whether he or she (1) is related to either party; (2) has any interest in the cause; (3) has expressed or formed any opinion; or (4) is sensible of any bias or prejudice. *See* Code § 19.2-262.01; *see also* Rule 3A:14 (listing four similar factors and two additional grounds for inquiry into the jurors' bias or prejudice against either party, or inability to give a fair and impartial trial). Jurors are required to reveal any knowledge relative to the fact in issue while in open court. Code § 19.2-262.01.

To be impartial, "[e]very prospective juror must stand indifferent to the cause, 'and any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused.'" *Taylor*, 61 Va. App. at 23 (quoting *Breeden v. Commonwealth*, 217 Va. 297, 298 (1976)). "It is the duty of the trial court, through the legal machinery provided for that purpose, to procure an impartial jury to try every case." *Lovos-Rivas*, 58 Va. App. at 60 (quoting *Salina v. Commonwealth*, 217 Va. 92, 93 (1976)).

However, "there are no hard and fast rules" to determine whether a jury is impartial, "and each case must be determined under its own set of facts." *Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 387 (1986).

C.  Two- Part Test for New Trial Based on Juror's Dishonest Answers in Voir Dire

The Supreme Court of the United States developed a two-part test to determine when a party is entitled to a new trial based on juror dishonesty during voir dire in *McDonough Power Equipment, Inc.*  Under this test, a litigant:

> [M]ust first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*Blevins*, 267 Va. at 297 (citing *McDonough Power Equip., Inc.*, 464 U.S. at 556).

D.  Terry Did Not Prove Both Prongs of the *McDonough* Test

1.  The Circuit Court Did Not Abuse its Discretion When it Concluded Flowers Did Not Intentionally Lie During Voir Dire

Pursuant to the *McDonough* test, our first inquiry is whether the circuit court abused its discretion when it found Flowers' explanation for her silence "credible."  We examine Flowers' candor at two points in the trial, 1) when she heard the names on voir dire and 2) when she recognized the men during trial.

a.  Flowers' Honesty During Voir Dire

The parties each cite to *Blevins*, which concerned a defendant's motion for mistrial based on juror untruthfulness during voir dire.  267 Va. at 293.  The victim in *Blevins* was sexually assaulted by the defendant in a parking garage; the jurors all responded negatively to a voir dire question asking whether they or a family member had ever been a victim of a serious offense. *Id.*  Immediately following the conclusion of the trial, a juror mentioned to a courtroom deputy that she did not park in garages because she had been the victim of an armed robbery in a parking garage thirteen to fifteen years earlier.  *Id.* at 293-95.  The deputy told the Commonwealth's attorney, who told defense counsel.  *Id.* at 294.  Defendant moved for a mistrial based on the juror's failure to reveal she had been the victim of a serious offense in

response to a question on voir dire. *Id.* In a subsequent hearing, the juror explained that she did not hear or understand the question about the serious offense, because if she had she "would have raised both hands up to have not been on this trial." *Id.* She insisted she had not deliberately withheld information. *Id.* The court then asked whether her prior bad experience affected her ability to give a fair and impartial trial, to which she answered "[a]bsolutely not; I did my judgment on the evidence and the evidence only. It was nothing personal . . . it had no effect on my decision at all" and explained she was "not bias[ed]." *Id.* The trial court found that the defendant had not proven that the juror failed to answer honestly by deliberate evasion, nor had he proven a valid challenge for cause based on juror bias against the defendant. *Id.* at 295. This Court affirmed the ruling, explaining "[b]ecause the evidence supported the trial court's findings that the juror's failure to answer the [question] was accidental rather than intentional and that she stood impartial to the cause, its denial of [the motion for mistrial] was not error." *Id.* at 296 (first alteration in original). Defendant appealed to the Supreme Court, which affirmed this Court and found that the findings of the trial court were fully supported by the evidence; the juror was free of bias and she acted impartially. *Id.* at 297. It noted in particular that the juror did not *intentionally* give a wrong answer and that she "decided the case impartially based upon the evidence presented at trial [and the defendant] failed to establish either part of the two-part *McDonough* test." *Id.* Thus, *Blevins* directs us to determine a juror's honesty based on whether the incorrect answer was given accidentally or intentionally.

Flowers explained why she did not acknowledge a relationship with Barnes, Cunningham, or Terry during voir dire—she didn't recognize them by name only. She knew Barnes by a different name and had not seen him in years, she worked with Cunningham four years prior, for only two weeks, and knew him by a different name, and she barely knew Terry.

- 11 -

Indeed, Terry himself denied having ever spoken to Flowers in his life. The circuit court found Flowers credible and believed her explanations.

While we accept the circuit court's credibility findings, we are not unsympathetic to Terry's position. Flowers recognized her erroneous responses early in the trial when an alternate juror was available. She failed to inform the court of her mistake—but the circuit court accepted her explanation for why she did so. The court further found her to be unbiased and impartial. The circuit court was in a better position to determine Flowers' credibility, and Flowers' testimony was sufficient to support the circuit court's finding. Thus, we do not find error in the circuit court's decision, and it was not plainly wrong for the court to determine Flowers answered honestly during voir dire, and her incorrect answer was not given intentionally.

### b. Flowers' Conduct During Trial

Terry argues that, even if Flowers was honest during voir dire, she was dishonest by failing to disclose that her voir dire answers were incorrect once she realized the error. The circuit court focused on Flowers' honesty during voir dire and her testimony. The court also denied Terry's motion to set aside the verdict, in part, because Flowers was found to be impartial.[3]

We recognize that a juror's conduct beyond voir dire must be impartial, consistent with the well-established Sixth Amendment right to an impartial jury, as applied to Virginia by the

---

[3] *McDonough* and its progeny do not address whether it is dishonest to remain silent upon a subsequent realization that a voir dire answer is incorrect; in fact, the *McDonough* test explicitly limits the inquiry to whether "a juror failed to answer honestly a material question *on voir dire*." *Blevins*, 267 Va. at 297 (emphasis added). Thus, by the clear language of *McDonough*, we do not look outside of a juror's responses on voir dire. Flowers' decision to remain silent—upon realizing her voir dire answers were incorrect—occurred outside of voir dire.

Fourteenth Amendment.[4]  However, Terry does not extend his argument to include a Sixth Amendment claim of juror bias.  Had he done so, we would consider whether the juror was actually biased, regardless of whether she was honest, without restricting our review to voir dire responses.  "Failure to satisfy the requirements of *McDonough* does not end the court's inquiry, however, when the petitioner also asserts a general Sixth Amendment claim challenging the partiality of a juror based upon additional circumstances occurring outside the voir dire." *Fitzgerald v. Greene*, 150 F.3d 357, 362-63 (4th Cir. 1998).

That Terry raised a *McDonough* challenge rather than a general Sixth Amendment claim does not impact the outcome on this particular appeal.  The remedy for allegations of jury partiality is a hearing in which the defendant has the opportunity to prove actual bias.  *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  In this case, Terry was given an opportunity post-trial to establish whether Flowers was actually biased.  As explained *infra*, the circuit court did not err in finding Flowers had no actual bias—thus, even if Terry had raised a general Sixth Amendment claim on appeal, it would fail.

---

[4] Jurors are prohibited from conduct that can create bias even after voir dire has concluded.  *See Remmer v. United States*, 347 U.S. 227, 229 (1954) (finding that private communication between jurors and outside persons about the pending matter is presumptively prejudicial); *McGuire v. Howard*, 203 Va. 965, 967-71 (1962) (reversing and remanding a case for a new trial where a juror took himself to the scene of the collision at issue, reenacted details of the motor vehicle collision, then drew a sketch for and described his findings to other jurors); *Thompson v. Commonwealth*, 219 Va. 498, 500 (1978) (explaining that reading or hearing the news about the trial does not "in every case amount to prejudicial misconduct by the jury as a matter of law [though] [s]ome publicity to which jurors have been exposed . . . may have effectively prejudiced the jury in its deliberation"); *Haddad v. Commonwealth*, 229 Va. 325, 329 (1985) (finding it was juror misconduct supporting reversal when a juror was prejudiced in the case, as evidenced by his comments to two attorneys at lunch suggesting they should feel guilty that they helped criminals walk the street, and commenting his "client" wouldn't "get off"); *Riner v. Commonwealth*, 268 Va. 296, 311-13 (2004) (noting in discussion that a juror was dismissed from service after he had been seen attempting to discuss evidence with other jurors during the trial, and admitted to doing so when questioned).

## 2. The Circuit Court Did Not Abuse its Discretion When it Determined a Correct Response Would Not Have Provided a Valid Basis for Challenge for Cause

The second part of *McDonough*—that a correct response would have provided a valid basis for a challenge for cause—requires Terry to prove that Flowers was not impartial. A valid basis for cause exists where a juror is not indifferent to the cause at hand. *Taylor*, 61 Va. App. at 23; Code § 19.2-262.01. "If he has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." *Lovos-Rivas*, 58 Va. App. at 60-61 (quoting *Spangler v. Ashwell*, 116 Va. 992, 996-97 (1914)).

Impartiality is not proven simply because Flowers was aware of, or even knew, Terry, Barnes, or Cunningham. "Although a potential juror may have some knowledge of the case, or preconceived or even erroneous notions about the legal system, the 'test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.'" *Ramos v. Commonwealth*, 71 Va. App. 150, 157 (2019). Only in exceptional circumstances is bias implied because of a juror's relationship to someone involved in the trial. *McDonough*, 464 U.S. at 556-57 (Blackmun, J., concurring); *see Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988) ("Implied bias 'is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial under the circumstances.'"). Virginia disfavors "per se rules of disqualification [of a juror] which are based on 'a presumption of [juror] bias or prejudice.'" *Bay v. Commonwealth*, 60 Va. App. 520, 531-32 (2012) (quoting *McGann v. Commonwealth*, 15 Va. App. 448, 454 (1992)) (noting cases where *per se* disqualification did apply, including when a juror was a current client

of counsel, when a juror's brother was a witness, and when a juror was stockholder in a company that was a party).

### a. Terry Did Not Prove Flowers' Knowledge of the Witness, Barnes, Would Support a Challenge for Cause

A relationship by blood or marriage to a party or victim is one of the exceptional circumstances in which the potential for prejudice is inherent. *Gray v. Commonwealth*, 226 Va. 591, 594 (1984). Barnes, the Commonwealth's witness, is the only person involved in the trial with an alleged familial relation to Flowers, though the nature of the relation was not proven.[5] Even assuming this omission is not fatal to the argument, the relationship between Barnes and Flowers is not sufficient to establish inherent prejudice. Code § 19.2-262.01 considers whether the juror is related to either *party*. (Emphasis added). This inherent prejudice also applies where a juror is related to a victim. *Brooks v. Commonwealth*, 41 Va. App. 454, 460 (2003). On the contrary, this Court has held that a familial relationship between a juror and a prosecution witness "alone does not warrant the exclusion of an otherwise competent juror for bias" and "there is no *per se* rule disqualifying a prospective juror who is related to a prosecution witness on the grounds that he is presumed to be biased, or not indifferent in the cause." *Bay*, 60 Va. App. at 531 ("There is no *per se* disqualification rule for a prospective juror related to a prosecution witness [or] a current or past acquaintance between a juror and a prosecution witness[.]"); *Mayfield v. Commonwealth*, 59 Va. App. 839, 845, 847-48 (2012) (finding no abuse

---

[5] This blood relation was Terry's burden to prove. Flowers testified that her family referred to Barnes as a cousin, but she wasn't sure if their bloodlines actually crossed. There was no evidence put on to establish whether they were still actively family (in the case of a relation through marriage) or whether they were cousins by blood or simply affinity. *See Doyle v. Commonwealth*, 100 Va. 808, 810-811 (1902) (distinguishing blood relatives by those connected only through marrying blood relatives, and finding no error where an uncle of one juror was a brother-in-law through marriage to an uncle of a witness); *see also Brooks*, 41 Va. App. at 460 ("the long-standing common-law rule disqualif[ies] a venireman who is related, within the *ninth degree* [to a party or victim]" through blood or marriage (emphasis added) (quoting *Gray*, 226 Va. at 593)).

of discretion where the trial court declined to strike a juror for cause because she was related to a prosecution witness, given there was no evidence presented to establish bias between the juror and witness).

The testimony from Flowers and Torrain indicated there was no relationship between Flowers and Barnes, her "cousin," at the time of the underlying events or the trial. There is no presumption that Flowers was biased for or against Terry because of her relationship with Barnes, and she testified unequivocally that her ability to be fair and impartial was not affected by this relationship. Terry did not put on any evidence to establish that Flowers was biased against Terry because of any relationship with Barnes—to the contrary, Flowers was not even asked whether she had a good relationship with Barnes when she last saw him. The circuit court specifically articulated its finding that Flowers was credible when she testified she was not biased, and we defer to its credibility determinations. Therefore, the circuit court's ruling on the motion was not error, nor was its finding that Flowers' relationship with Barnes did not cause her to be biased.

        b. <u>Terry Did Not Prove that Flowers' Knowledge of Terry Would Support a Challenge for Cause</u>

Terry appeals the circuit court's denial of his motion and supplemental motion to set aside—neither of those motions mentions Flowers' knowledge of Terry himself. During the hearing on these motions, Flowers testified about her limited relationship with Terry, and Terry testified that he did not know her. Assuming that the issue of Flowers' knowledge of Terry is preserved and properly before us on appeal, Terry failed to prove that a relationship between Flowers and Terry would have supported a valid challenge for cause. Torrain did not remember ever seeing Flowers and Terry interact while growing up, Flowers remembered saying hello in passing occasionally, and Terry testified that he had never spoken to Flowers in his life and did not know her. There was no familial or other relationship between the two that created a

- 16 -

presumption of bias. Terry provided no evidence as to why Flowers would be biased against Terry simply because she had known him in childhood. Flowers testified that she decided the case based on the evidence, and the circuit court believed her testimony that she was not biased. We defer to the circuit court's credibility finding and find no abuse of discretion.

### c. Terry Did Not Prove That Flowers' Knowledge of the Victim, Cunningham, Would Support a Challenge for Cause

As the circuit court noted, this is the most difficult of the three relationships to grapple with, given the social media post. However, the relationship between Flowers and Cunningham does not call into question most of the factors in Code § 19.2-262.01 or Rule 3A:14; Flowers was not related to Cunningham, had no interest in the cause, did not indicate she had formed any opinion about guilt, and did not acknowledge she was sensible of any bias or prejudice therein. The only factor to consider is whether her relationship with Cunningham caused her to develop a bias against Terry. Flowers' testimony established that she did not even know Cunningham's real name, that she had known him for only two weeks, and that she found out about his death through Facebook (as opposed to a call from a family member or mutual friend). According to her testimony, she did not even look up the events surrounding his death. Torrain never saw Cunningham interact with Flowers. Flowers testified that she had not spoken to Cunningham since the two-week period in which they had worked together several years in the past.

Flowers' Facebook post did indicate that she knew Cunningham and that he made her laugh; however, this is not enough to raise a valid basis for a challenge for cause. Even where a juror has some type of non-familial relationship to the defendant, they are not necessarily incompetent to serve as a juror. Virginia has historically found jurors competent despite a relationship to the case, perhaps in situations even more concerning than this one. *See Richardson v. Planter's Bank of Farmville*, 94 Va. 130, 134-35 (1896) (declining to presume that a juror was incompetent because they were a debtor of the defendant bank, noting that to find

- 17 -

otherwise would "estimate too cheaply integrity under the sanction of an oath"); *Spangler*, 116 Va. at 995-97 (concluding the juror was not incompetent simply because his brother had a claim against the defendant in a similar case involving a purchase of mineral rights by an agent of defendant); *Brooks*, 41 Va. App. at 460-62 (rejecting an argument that bias existed simply because the juror's sister was married to the great-uncle of the victims); *Huguely v. Commonwealth*, 63 Va. App. 92, 127 (2014) (finding no error where court denied motion to strike a juror, a professor at victim's university, who taught a friend of the victim's at the time of victim's death and gave the friend a postponement of an exam to attend the funeral, but could not remember the friend's name and said this had no impact on how she viewed the case); *cf. Williams v. Commonwealth*, 14 Va. App. 208, 215-16 (1992) (finding error where four of the jurors were not impartial, including one that gave a eulogy at the victim's funeral, one who had worked with the murder victim for three or four months and was involved in the events of the stabbing, and one who knew the victim's family for a long time and knew the events surrounding the victim's death).

Again, Flowers testified that she made her decision based on the evidence at trial and was not biased. The circuit court found her testimony credible, and we defer to that finding. Though the relationship between Cunningham and Flowers is troubling, there is no basis here to find that the circuit court abused its discretion.

### E. Public Confidence

Terry's argument on brief suggests that this Court should reverse the circuit court because it must maintain public confidence in the integrity of the judicial system, including jury selection. The Supreme Court of Virginia has recognized that "in constituting the jury panel, '[p]ublic confidence in the integrity of the process' is also 'at stake.'" *Perez*, 40 Va. App. at 658 (quoting *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001)).

As the Commonwealth notes, the public confidence argument was not raised by Terry before the circuit court. Case law requires that a public confidence objection must be raised specifically to be preserved on appeal. *Mayfield*, 59 Va. App. at 846 ("[T]he issue of striking a juror for bias is distinct from the issue of striking a juror to maintain public confidence in the judicial system. Thus, raising the former . . . does not preserve the latter for appeal."); *Blevins*, 267 Va. at 296 (refusing to consider the public confidence issue because it was not raised in the trial court); *Townsend*, 270 Va. at 332 ("Public confidence in the integrity of the judicial system, as a ground for excluding a juror for cause, must be raised in the trial court or that issue is waived [any implication that it may be raised on appeal for the first time] is expressly rejected.").[6]

### Conclusion

Terry has not met the prongs of *McDonough* and therefore he was not entitled to a new trial. The circuit court did not err in finding that Flowers was honest on voir dire. Similarly, the circuit court found Flowers was impartial in hearing the case based on her testimony. The record

---

[6] Even if the issue were preserved, under these unique and discrete facts, the public confidence principle is not violated here. Allowing a juror to remain impaneled despite a familial relationship to a witness may, in some cases, be sufficient to erode public confidence. *Barrett*, 262 Va. at 826-27 (finding it was an abuse of discretion for the trial court to refuse to strike a juror for cause when the juror was a brother of a police officer testifying as a witness for the Commonwealth, even though the brother insisted he was impartial). However, Flowers was only alleged to be related to a witness, Barnes, and the nature of their relationship was not proven. This is insufficient to establish that Flowers' position on the jury would erode public confidence in the integrity of the criminal justice system. *See Brooks*, 41 Va. App. at 460-62 (disagreeing with appellant's argument that a juror was disqualified, and inherently biased, because her sister was married to the great-uncle of the victims, was the uncle of the victims' father, and was a witness in the case). For non-familial relationships, the public confidence principle requires a contemporaneous or continuing relationship, which was not proven here. *Perez*, 40 Va. App. at 658-59 (finding no error where a juror remained on the jury, despite knowing the prosecution's detective through the detective's prior investigation of a crime against the juror's daughter, because there was no "contemporaneous or continuing relationship" between them).

supports these conclusions.  Therefore, we affirm the circuit court's ruling denying the motion to set aside the verdict.

*Affirmed.*