733 S.E.2d 129

**Franklin TAYLOR, s/k/a Franklin Wayne Taylor**

v.

**COMMONWEALTH of Virginia.**

Record No. 0956–11–2.

Court of Appeals of Virginia,
Richmond.

Oct. 23, 2012.

14

16

Vinceretta Taylor Chiles (Chiles Law Offices, P.C., on briefs), Richmond, for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.

Present: Judges FRANK, HUMPHREYS and HUFF.

FRANK, Judge.

Franklin Taylor, s/k/a Franklin Wayne Taylor, appellant, was convicted, by a jury, of voluntary manslaughter, in violation of Code § 18.2–35. On appeal he contends the trial court erred in not striking Juror Lamb for cause, in admitting a prior conviction without proper notice, and in finding the evidence sufficient to convict. For the reasons stated, we reverse the judgment of the trial court.

## BACKGROUND

On the night of May 8, 2010, Crystal Horton parked her car in a public parking lot near the 17th Street Farmer's Market in Richmond and went to the Visions nightclub. Horton left the club at 1:30 a.m. on May 9, 2010. As she arrived at the parking lot, Horton heard several gunshots and observed someone step out from between two cars with his arm pointing. Horton then heard more shots. She described the

shooter as a thin black male, between 5'7" and 5'9", wearing a dark-colored hat, t-shirt, and blue jeans.

Horton left the parking lot quickly but saw the shooter again as he was walking across 17th Street to Franklin Street. The man was not walking normally; he was holding his arm to his back. He appeared to have an angry or hurt expression. Horton saw a police officer who had responded to the scene. She reported the incident to the police.

Richmond Police Officer Kurtis Jinks was parked at 18th and Grace Streets at the time of the incident. Around 2:00 a.m. on May 9, 2010, Jinks heard approximately six gunshots from an area behind his location. He traveled two blocks to the parking lot near the Farmer's Market, where he discovered the body of a man later identified as Reshawn Thurman. Thurman's body was lying next to the open door of his vehicle, and Jinks saw a gun lying next to the body. Jinks secured the scene. Detectives arrived within minutes.

Forensic Detective Eugene Provost arrived at the shooting scene at 2:36 a.m. Provost observed the magazine of a .40 caliber Glock pistol lying next to the victim. The magazine was fully loaded with 13 cartridges, and there was another cartridge in the chamber.[1] Provost also saw a spent .40 caliber shell in front of the victim's vehicle. Next to the victim's body, Provost saw two spent 9 mm shell casings and a man's gold ring with a diamond cluster.

Provost recovered keys from the seat of the victim's car and a cell phone on the floorboard. From the trunk of the victim's car, Provost found two boxes of .40 caliber ammunition and numerous pill bottles containing controlled substance pills; $690 in U.S. currency was found on the victim's body.

Provost also found a blood stain on the right fender of the victim's vehicle. Provost swabbed red stains leading away from the body. He followed the trail of blood away from the

---

1. The clip had the capacity to hold 14 cartridges in the magazine and one in the chamber.

scene to 18th Street, then 19th Street, then to Franklin Street to the Have a Nice Day Café.

The detective found blood in the parking lot behind the Have a Nice Day Café, but no shell casings. Essentially, Provost found dripping blood stains from the victim to the Have a Nice Day Café. The detective also found a blood stain on a Buick in which appellant rode to the hospital. All swabs from the various blood stains were sent to the state laboratory.

On May 9, 2010, around 10:00 a.m., K–9 Police Officer Anthony Jackson and his bloodhound "Hopper" arrived at the homicide scene. Detective Provost provided a scent sample from the swabs of blood found at the scene. Jackson gave the dog the scent item. The dog then followed that scent several blocks, to the alley at the rear of the Have a Nice Day Café.

Earlier on May 9, 2010, around 2:15 a.m., Barbara Logan and the appellant's cousin left Visions nightclub. The victim had also been at the club. He left earlier, around 1:40 a.m. Shortly thereafter, the cousin received a telephone call from appellant who reported he had been shot. The women began running towards the Have a Nice Day Café, where they found appellant in the alley behind that club. He was sitting on the ground, slumped over and bleeding. Logan called her husband to bring a car to transport appellant to the hospital. Logan called 911 on the way to the hospital. Police officers were waiting for them when they arrived at the hospital.

On May 10, 2010, appellant spoke to Detective Arcellious Demery in the hospital. Appellant told Demery that he was standing in the parking lot of the Have a Nice Day Café when a man approached and shot him. Upon additional questioning from Detective Demery, appellant said the man had attempted to rob him. When appellant would not allow the man to search his pockets, the man shot appellant. When appellant fell to the ground, he did not see the direction the shooter fled. Appellant initially said the man took $100 but then changed that amount to $80. Appellant also said the assailant took his watch and ring. Demery told appellant he had a photograph

of a ring recovered from the Have a Nice Day Café lot. The photograph actually depicted the ring recovered from the ground next to Thurman's body. Appellant looked at the photograph and identified the ring as his.

Appellant told the detective the entire incident occurred in the Have a Nice Day Café lot. Officer Michael Morris was working in an off-duty capacity at the Have a Nice Day Café on the night in question. Between 10:30 p.m. on May 8 and 3:00 a.m. on May 9, 2010, Morris did not hear any gunshots or any other disturbance.

Detective Provost obtained a buccal swab from appellant. Provost submitted the sample for DNA testing, along with blood swabs collected from the blood droplets that led from the victim to the Have a Nice Day Café. Forensic scientist Lisa Schiermeier–Wood tested several of the blood samples and concluded the chances the blood belonged to anyone other than appellant were one in 6.5 billion. Schiermeier–Wood also concluded that Thurman could not be eliminated as the donor of the blood found on the car at the homicide scene.

On August 20, 2010, the Commonwealth, pursuant to Code § 19.2–295.1, provided notice to appellant of its intention to introduce evidence of prior convictions at appellant's trial. The prosecutor listed among the prior convictions a manslaughter conviction in 2004 from King William County.

Appellant's trial ended in mistrial when the jury could not reach a verdict. The Commonwealth did not, prior to the new trial, give appellant further notice of its intention to reintroduce evidence of the manslaughter conviction.

During the new trial, appellant moved to strike Juror Lamb for cause, because of the following exchange that occurred during *voir dire:*

[Appellant's Counsel]: Do any of you believe that the police are any more credible than any other witness or anyone else who can take the stand?

[Venire]: No response.

[Appellant's Counsel]: Does anyone believe that—Does everyone believe, shall I say, that every witness who is placed on the witness stand swears to tell the truth and that you are obligated to believe the witness, unless there is some reason why you shouldn't?

Juror Lamb: I think I'd believe the cop more.

After Lamb made this statement, the following dialogue took place:

The Court: Morning. You indicated in response to one of the questions that you might tend to believe a police officer before you would believe somebody else.

Juror Lamb: Yes, sir.

The Court: Do you understand that you are allowed to make judgments about the witnesses after you have heard all the evidence?

Juror Lamb: Yes.

The Court: But you have to be impartial in judging that evidence until there is a reason for you to believe or disbelieve.

Juror Lamb: Yes.

The Court: You have to make a judgment and not be influenced by the fact that somebody is a police officer or somebody else. Do you understand that to be the law?

Juror Lamb: Yes.

The Court: Can you follow that?

Juror Lamb: Yes, sir.

The Court: Also, Ms. Chiles may have questions.

Ms. Chiles: Mr. Lamb, your initial response was that you believe that you would in fact believe a police officer more than any other witness; correct?

Juror Lamb: Yes, ma'am.

Ms. Chiles: Is that still the case?

Juror Lamb: I believe that I can try to be impartial.

Ms. Chiles: But you don't come to this scenario with the understanding that you are in fact impartial? You do

believe that police officers are more honest than anybody else?

Juror Lamb: I just have respect for police officers. I don't know if that answers your question.

Mr. Santos: If you thought that the officer was not telling the truth, would you give any credit to what he said?

Juror Lamb: No. If I believed he was lying, no.

The trial court denied appellant's motion to strike Juror Lamb for cause, forcing appellant to exercise a peremptory strike on Lamb.

Appellant objected to the introduction of his prior manslaughter conviction order at the sentencing phase, on the grounds that the Commonwealth had failed to advise the defense prior to the re-trial that it again intended to introduce the prior conviction order. The court overruled the objection. Following appellant's conviction, at the sentencing phase of the jury trial, the Commonwealth introduced the prior manslaughter order.

This appeal follows.

## ANALYSIS

### Juror Lamb

■ Appellant first contends the trial court erred in not striking Juror Lamb for cause because of his perception that police officers are more credible than other witnesses.[2]

■ The right to be tried by an impartial jury is guaranteed under both the United States and Virginia Constitutions. *Swanson v. Commonwealth,* 18 Va.App. 182, 184, 442 S.E.2d 702, 703 (1994); *see also* Code § 8.01–358. For that guarantee to be effective, persons accused of violating criminal laws must be provided with "an impartial jury drawn from a panel [of twenty] free from exceptions." *Breeden v. Commonwealth,*

---

2. Appellant did not argue below nor in his brief that public confidence in the integrity of the judicial system disqualifies Juror Lamb. We will not raise the issue *sua sponte.*

217 Va. 297, 300, 227 S.E.2d 734, 736–37 (1976). Every prospective juror must stand indifferent to the cause, "and any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." *Id.* at 298, 227 S.E.2d at 735.

> If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion. For, as has been well said, it is not only important that justice should be impartially administered, but it also should flow through channels as free from suspicion as possible.

*Id.* (quoting *Wright v. Commonwealth,* 73 Va. (32 Gratt.) 941, 943 (1879)). These principles must be strictly applied, and when a prospective juror equivocates about whether he or she has formed a fixed opinion, the prospective juror should be stricken by the trial court. *Id.* (citing *Dejarnette v. Commonwealth,* 75 Va. 867 (1881)).

However, [i]t is not uncommon to discover during *voir dire* that prospective jurors have preconceived notions, opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or about the particular case. The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already. Thus, the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.

Given that the trial court is able to see and hear each member of the venire respond to questions posed during *voir dire,* it is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath. Juror impartiality is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal. Accordingly, the decision to retain or exclude a prospective juror will not be disturbed

on appeal unless there has been manifest error amounting to an abuse of discretion.

*Lovos–Rivas v. Commonwealth,* 58 Va.App. 55, 61, 707 S.E.2d 27, 30 (2011) (internal quotations and citations omitted).

 In conducting our review, we consider the juror's entire *voir dire,* not merely isolated statements. *Vinson v. Commonwealth,* 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), *cert. denied,* 530 U.S. 1218, 120 S.Ct. 2226, 147 L.Ed.2d 257 (2000).

In an appropriate case, counsel may inquire of prospective jurors whether they would give greater or less weight to the testimony of a police officer than to that of another witness simply because of his official status. A defendant cannot be fairly tried by a juror who would be inclined to give unqualified credence to a law enforcement officer simply because he is an officer.... [But] jurors have a right and a duty to determine credibility and to believe, in a particular case, the testimony of a law enforcement officer over that of a defendant.

The credibility of witnesses is a matter for the jury to decide, weighing such factors as the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and observing the things about which they testify, their interest in the outcome of the case, their bias, and if any had been shown, their prior inconsistent statements and prior criminal convictions. For a juror to give unqualified credence to the testimony of a law enforcement officer and to decide credibility issues solely on that basis is an impermissible basis for resolving credibility and would constitute bias. When it is anticipated that a major part of the prosecution's case will hinge upon a credibility determination between prosecution witnesses who have an official status and other defense witnesses who do not, then not only is such an inquiry of whether jurors would give unqualified credence to those witnesses appropriate but may be required.

*Mullis v. Commonwealth,* 3 Va.App. 564, 571, 351 S.E.2d 919, 923–24 (1987) (internal quotations and citations omitted).

In this case, Juror Lamb initially stated he would believe a police officer is more credible than another witness. At that point, neither defense counsel nor counsel for the Commonwealth sought any clarification of Lamb's statement. After the *voir dire* of other veniremen, the court made further inquiry regarding Lamb's position. In a series of leading questions propounded by the court,[3] Lamb responded affirmatively when the court asked him if he understood that he was required to make a judgment without being influenced by the fact that a witness might be a police officer, that he must be impartial in judging the evidence until there is a reason to believe or disbelieve the evidence, and that he must make judgments about the witnesses after hearing all of the evidence. Lamb then indicated he could follow the law.

At that point, the leading questions by the court seemed to rehabilitate Lamb's stated views on the credibility of police officers. However, defense counsel then reminded Lamb of his initial response that he would believe a police officer over any other witness. Defense counsel asked Lamb whether that was still the case. Lamb responded that he believed he could try to be impartial.

Defense counsel then asked, "But you don't come to this scenario with the understanding that you are in fact impartial? You do believe that police officers are more honest than anyone else?" Lamb responded, "I just have respect for police officers. I don't know if that answers your questions." It is interesting to note that after Lamb responded to the court's leading questions that he would not be influenced by the fact that a witness is a police officer, Lamb continued to equivocate. He could only respond that he would "try" to be impartial. In response to defense counsel's follow-up ques-

---

**3.** Defendant did not object to the leading nature of the trial court's questions. While we do not consider the leading questions as a basis for reversal, the nature of the rehabilitative questions is relevant to whether the juror is impartial.

tions, Lamb at no time said he would, in fact, be impartial, although he was given numerous opportunities to do so.

The Commonwealth's attorney then asked Lamb, "If you thought the officer was not telling the truth, would you not give any credit to what he said?" Lamb responded, "No. If I believed he was lying, no." In deciding not to strike Lamb for cause, the trial court focused on that last response from Lamb.

Lamb's last answer does not establish that he is impartial or would not give undue weight to a police officer's testimony. Lamb starts with the premise that he would believe a police officer over another witness. This is the lens through which he would evaluate whether the officer is lying. It is not a neutral evaluation.

Our analysis is controlled by *Breeden,* 217 Va. 297, 227 S.E.2d 734. In that case, a prospective juror in a murder trial was asked by defense counsel on *voir dire* whether the defense had to prove the accused was innocent. The juror replied affirmatively. After the trial judge and the prosecutor received favorable replies to their rehabilitative questions, the juror was placed on the panel of twenty veniremen. The defense used a peremptory challenge to exclude her.

With respect to the "crucial question" whether the accused had to prove his innocence, the Supreme Court of Virginia noted that the juror's affirmative response "was not so much a symptom of her ignorance of the law as a candid reflection of the state of her mind concerning Breeden's guilt." *Id.* at 300, 227 S.E.2d at 736. Continuing, the Court said that the efforts of the trial judge and the prosecutor to rehabilitate Mrs. Plummer did not assuage the Court's concern, as she had merely given expected answers to leading questions. Proof that a prospective juror is impartial and fair, the Court concluded, " 'should come from him and not be based on his mere assent to persuasive suggestions.' " *Id.* (quoting *Parsons v. Commonwealth,* 138 Va. 764, 773, 121 S.E. 68, 70 (1924)).

In the instant case, despite the efforts of the court to rehabilitate him, Lamb reverted to his original position regarding the credibility of police officers versus other wit-

nesses, thus indicating he maintained a fixed position on credibility. *See Justus v. Commonwealth,* 220 Va. 971, 976, 266 S.E.2d 87, 91 (1980).

In *Mullis,* 3 Va.App. at 569, 351 S.E.2d at 922, during *voir dire* examination of the jury, defense counsel asked:

> [I]f a police officer gives some testimony and a private citizen gives testimony that differs from what the police officer said—are there any of you who would believe or have a tendency to believe the police officer as opposed to the private citizen? . . . This is if all things are equal.

Four prospective jurors answered either "yes" or "probably." *Id.* Other than the one general abstract question, defense counsel did not pursue the inquiry. *Id.* at 569, 351 S.E.2d at 923. At the conclusion of *voir dire,* defense counsel moved to strike the four prospective jurors for cause, contending that they were biased for the prosecution. The trial judge denied the challenge for cause. *Id.* at 570, 351 S.E.2d at 923. We affirmed the trial court, concluding:

> The general abstract question put to the jurors, without more, made it difficult for them to give a meaningful answer and is a poor indication of the manner in which they would serve as jurors and evaluate any particular police testimony. Certainly their responses did not indicate to the trial judge who heard the entire *voir dire* and observed the prospective jurors that they would give unqualified credence to the testimony of a police officer. At most, their responses indicated that as an abstract proposition they would probably or would have a tendency to give some weight to the fact that a witness was a police officer in resolving credibility issues if all else were equal.

*Id.* at 571–72, 351 S.E.2d at 924.

*Mullis* does not control here. In that case, there was only one question as to the weight to be given to an officer's testimony. There were no follow up questions. Here, we have more than a "general abstract question." Both the court and defense counsel *voir dired* Lamb as to the implications of his statement. Ultimately, Lamb believed he would *try* to be

impartial, thus creating a reasonable doubt as to his impartiality.

Even though circuit courts have wide latitude in the seating of jurors, courts must be mindful that if any reasonable doubt exists regarding whether a juror stands indifferent in the cause, that doubt must be resolved in favor of the defendant. A juror's ability to give a defendant a fair and impartial trial must not be left to inference or doubt.

*Green v. Commonwealth*, 262 Va. 105, 117–18, 546 S.E.2d 446, 452 (2001).

*Clements v. Commonwealth*, 21 Va.App. 386, 464 S.E.2d 534 (1995), is instructive. Juror Brown, during *voir dire*, indicated he had heard rumors/gossip that the accused may have committed the offense and had an opinion as to the accused's guilt. *Id.* at 388–89, 464 S.E.2d at 535–36. In response to other questions, Brown said he did not think he had formed an opinion. When asked by the court if he came into the trial with some sort of predisposition against people who are charged with sexual offenses, the juror responded "slightly." *Id.* at 391, 464 S.E.2d at 537. The trial court then inquired whether the juror could keep an open mind and wait until all of the evidence is presented before he would form any opinion, the juror answered "I would try my best to keep an open mind." *Id.* at 392, 464 S.E.2d at 537.

This Court found the trial court erred in not striking Brown for cause, determining Brown's responses raised reasonable doubt as to his impartiality. We concluded:

[Brown's] honest answers disclosed equivocation and revealed doubt that he would be able to render a fair verdict. Brown concluded the *voir dire* by saying only that he "would try" to be fair, thereby indicating that what he had heard at the barber shop combined with what he knew had happened to a relative, might affect his decision.

*Id.* at 393, 464 S.E.2d at 538.

As in *Clements*, we hold that the *voir dire* of Juror Lamb raised reasonable doubt. Lamb's answers, while sincerely given, disclosed equivocation and revealed doubt as to his

impartiality. We are required to resolve any reasonable doubt about a juror's qualification in appellant's favor. Thus, we hold that the trial court erred when it seated Lamb on the panel.

Sufficiency

■ Essentially, appellant contends there was insufficient evidence to prove that he shot Thurman or that he possessed or fired a weapon. He further argues that no one identified appellant as the person who shot Thurman. However, the evidence in the record belies appellant's protestation of innocence.

When considering a challenge that the evidence presented at trial is insufficient, " 'we presume the judgment of the trial court to be correct,' *Broom v. Broom*, 15 Va.App. 497, 504, 425 S.E.2d 90, 94 (1992), and 'will not set it aside unless it is plainly wrong or without evidence to support it.' *Dodge v. Dodge*, 2 Va.App. 238, 242, 343 S.E.2d 363, 365 (1986)." *Davis v. Commonwealth*, 39 Va.App. 96, 99, 570 S.E.2d 875, 876–77 (2002). Moreover, we do not "substitute our judgment for that of the trier of fact." *Wactor v. Commonwealth*, 38 Va.App. 375, 380, 564 S.E.2d 160, 162 (2002).

> Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (internal citation omitted).

■ Appellant argues a reasonable hypothesis of innocence exists, i.e. that Thurman was shot by another person involved in the illegal sale of narcotics. He points to the $690 cash found on Thurman's body and the illegal controlled substances found in his car.

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Coleman v. Commonwealth*, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). "[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Hamilton v. Commonwealth*, 16 Va.App. 751, 755, 433 S.E.2d 27, 29 (1993).

*Simon v. Commonwealth*, 58 Va.App. 194, 206, 708 S.E.2d 245, 251 (2011).

■■■■■■ " 'The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.' " *Kelly v. Commonwealth*, 41 Va.App. 250, 258, 584 S.E.2d 444, 447–48 (2003) (*en banc*) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003)). Furthermore,

[w]hether the hypothesis of innocence is reasonable is itself a question of fact, subject to deferential appellate review. Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. By finding the defendant guilty, therefore, the factfinder has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.

*Clanton v. Commonwealth*, 53 Va.App. 561, 572–73, 673 S.E.2d 904, 910 (2009) (*en banc*) (internal quotations and citations omitted).

■■■■ The trial court's rejection of a hypothesis of innocence "is binding on appeal unless plainly wrong," *Archer v. Commonwealth*, 26 Va.App. 1, 12–13, 492 S.E.2d 826, 832 (1997), even if there is "some evidence to support" the hypothesis of innocence, *Hudson*, 265 Va. at 513, 578 S.E.2d at 785.

In the case before us, appellant denies he was at the scene of the shooting, yet the evidence reveals his blood was found at the scene and then traced to his location at the Have a Nice

Day Café. The blood swabs taken from the trail of blood revealed appellant's DNA. A trained bloodhound confirmed appellant's path. His ring was found next to the victim's body.

While not identifying appellant, a witness heard gunshots, and she observed the shooter walking away holding his arm. Appellant was wounded in the arm. The factfinder could properly conclude appellant was the person identified as the shooter. He was found slumped over and bleeding in the alley behind the club. Appellant told police he was shot and robbed in the parking lot of the café, but the evidence contradicted appellant's story. An officer working off duty at the club heard neither gunfire nor any disturbance. Clearly appellant lied to the police. "A defendant's false statements are probative to show he is trying to conceal his guilt, and thus is evidence of his guilt." *Rollston v. Commonwealth,* 11 Va.App. 535, 548, 399 S.E.2d 823, 831 (1991) (citing *Carter v. Commonwealth,* 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982); *Toler v. Commonwealth,* 188 Va. 774, 782, 51 S.E.2d 210, 214 (1949)).

Clearly, the jury rejected appellant's hypothesis of innocence. Viewed in its totality, the evidence is sufficient to prove appellant was guilty of voluntary manslaughter.

## CONCLUSION

We conclude that the Commonwealth's evidence was sufficient to convict appellant of voluntary manslaughter. We agree with appellant that the trial court erred in seating Juror Lamb after doubts were raised regarding his impartiality. As we are reversing on the juror issue, we note that there is little likelihood that the notice issue would arise again in a subsequent proceeding. Therefore, we will not address that issue. We reverse appellant's conviction and remand for a new trial.

*Reversed and remanded.*