COURT OF APPEALS OF VIRGINIA

Present:  Judges Fulton, Causey and Bernhard
Argued at Norfolk, Virginia


VAN JULIAN OVERBY

                                        MEMORANDUM OPINION[*] BY
v.       Record No. 0167-24-1           JUDGE DORIS HENDERSON CAUSEY
                                            SEPTEMBER 16, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Bonnie L. Jones, Judge

Charles E. Haden for appellant.

Allison M. Mentch, Assistant Attorney General (Jason S. Miyares,
Attorney General; Tanner M. Russo, Assistant Attorney General, on
brief), for appellee.


Following a jury trial, Van Julian Overby was convicted of second-degree murder and for

the use of a firearm in the commission of a felony.  The trial court sentenced Overby to 35 years'

incarceration with 12 years suspended.  On appeal, Overby argues that the trial court erred in

denying his motion to strike two jurors for cause.  Overby also argues that the trial court erred in

denying his motion to strike the charges of second-degree murder and use of a firearm in the

commission of murder.  For the reasons stated below, we hold that the trial court committed no

reversible error and affirm Overby's convictions.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the sufficiency

of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth,

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

On January 16, 2019, at 9:08 a.m., Isaac Allen Lamar Chappell was shot and killed in the parking lot outside Roy's Quick Serve on Shell Road in Hampton, Virginia. Surveillance footage from Roy's showed Chappell being shot by a person wearing a hooded sweatshirt or jacket. Responding officers attempted life-saving procedures, but Chappell was pronounced dead on the scene. Responding officers did not find any weapons on or near Chappell's body. The medical examiner determined that the cause of death was a single gunshot wound to the chest.[1]

On January 17, after Sergeant Giles of the Hampton Police Department received information implicating Overby in Chappell's murder, the Hampton and Newport News Police Departments collaborated to arrest Overby in Newport News. Overby was detained while walking with two other people. Overby and one of the two people with him submitted to an officer's commands and lay on the ground at least six yards apart from one another; the third individual ran away.[2] A black leather holster for a firearm was found within a foot of Overby's body. A pistol was found some distance[3] away from Overby and the other individual, in a location that all three individuals had passed by prior to being detained.

Therese Moynihan, a firearm and tool mark examiner for the Bureau of Alcohol, Tobacco, and Firearms, examined the evidence collected from the scene of the crime and from

---

[1] Officers recovered a baggie containing a white substance from Chappell's hand and drug paraphernalia from Chappell's pocket, and the medical examiner determined that Chappell had consumed alcohol and cocaine near the time of his death. Neither substance, however, caused Chappell's death.

[2] The person who ran away was later arrested while in possession of a full-size frame firearm.

[3] Giles estimated that the firearm was around twenty feet from where Overby was brought to the ground.

the location of Overby's arrest. Moynihan determined that the bullet recovered from Chappell's body and a shell found near Chappell's body were both shot from the same pistol that was discovered at the location of Overby's arrest.

Giles interviewed Overby on January 17.[4] During the interview, Overby denied killing Chappell or being present at the scene of the shooting. Overby told Giles that he had spent the entirety of January 16, beginning around 8:15 or 8:20 a.m., at his sister Tonya McNeil's house, after leaving his girlfriend's house early in the morning. Overby said he had stopped at the home of his child's mother along the way, but that she did not answer the door. During Overby's trial, Giles testified that he had served search warrants at the homes of Overby's two sisters while they were present but was not "able to verify [Overby's] alibi."

Overby confirmed that his Facebook username was "Van Baba Overby." Giles read Overby a series of private messages exchanged between this account and another account, which Overby confirmed belonged to his girlfriend, on January 16. Initially, as Giles read messages related to an argument over money, Overby appeared to acknowledge that they were genuine. But when Giles reached a certain portion of the exchange, Overby denied having sent those messages. Messages sent from Overby's account during that portion included, "I just caught a body," "U heard about the dude that got killed on shell road this morning," "Yeah [I] smoked somebody tryna kill me," and "Yeah but a murder charge bae." Overby's girlfriend's account responded with messages including "You had to do what you had to do" and "They don't know you did it . . . . Don't nobody [have] to know." Mixed in with the messages regarding the shooting were others referring to the financial dispute. Overby also denied sending a message

---

[4] During the police interrogation, Giles told Overby that the police had cellphone data that placed him on the scene of the crime. At trial, Giles acknowledged that he did not have any such records. Giles also told Overby that the video showed him committing the crime, but at trial, Giles acknowledged that he could not identify Overby from the video. Giles explained that making these statements was a police interrogation technique that officers are taught in training.

later that evening that read, "I have a fresh body damn." At one point in the interview, Overby appeared to acknowledge the authenticity of the earlier message concerning "the dude that got killed on shell road," explaining that he was merely asking his girlfriend if she had heard about it.

At trial, the Commonwealth presented testimony from the arresting officers regarding the location of the gun and holster, testimony from Moynihan about the forensic evidence, testimony and video evidence of Overby's interrogation, copies of the Facebook messages shown to Overby during the interview, and the testimony of a custodian for Meta, Facebook's parent company, as to the authenticity of the Facebook messages.

Overby presented the testimony of two witnesses. The first, Sean Saulsby, identified himself as a friend of Overby's brother-in-law. Saulsby testified that on January 16, he had spent "[p]robably an hour or two" with Overby, "hanging out" in an alley next to Roy's Quick Serve, starting between 7:00 and 8:00 a.m. Saulsby testified that Overby had left the alley to get on a bus sometime before the shooting occurred. Saulsby did not see who had shot Chappell, but did see someone running away from the scene wearing a red and black checkered jacket. Saulsby testified that that person was not Overby and that Overby had not been wearing a red and black checkered jacket when Saulsby had seen him.

The second defense witness was Darnell Morris, who identified himself as McNeil's boyfriend. Morris testified that he had seen Overby asleep on McNeil's couch at around 8:00 a.m. on January 16 and that he, Overby, and McNeil had spent the rest of the day together. Morris said that he and Overby had gone to the movies, to a bar, and "drunk" together. Morris stated that Overby left McNeil's house the next morning. He said that Overby had not at any point been, "to [his] knowledge," wearing a red and black checkered jacket. On cross-examination, Morris appeared to contradict his previous timeline, as he seemingly indicated that

he and Overby had spent the entirety of the 17th together. Subsequently, Morris explained that he did not remember exact dates, but that he was basing his recollection in relation to the day when the police had come to his house to serve a search warrant.

At the end of trial, the jury convicted Overby of second-degree murder and for use of a firearm in the commission of a felony.

*Jury Selection*

Prior to the beginning of trial, during jury selection, Overby's attorney asked the venire panel the following question:

> Who believes a police officer is less likely to lie under oath or to fabricate evidence or testimony because they are a police officer, that being a police officer imbues a witness with additional credibility that makes them more believable simply because they're an officer?

A number of jurors responded affirmatively, including Juror 25. Overby's attorney then asked the following follow-up question: "Does anyone else believe that officers are inherently more credible or trustworthy than any other witness?" Several additional jurors, including Juror 60, answered this question affirmatively.

The trial judge declined to strike for cause all the jurors who had said yes to either of those questions. Instead, the attorneys conducted individual voir dire with each juror who had answered affirmatively.

On individual voir dire, the attorneys engaged in the following colloquy with Juror 25:

> [Defense Counsel]: We briefly spoke about the reliability of police officers as witnesses. Do you believe that a witness is more believe[able] or more credible because they are a police officer?
>
> [Juror 25]: No.
>
> [Defense Counsel]: Does someone being a police officer make them more believable?
>
> [Juror 25]: You talking about credible, I guess?

- 5 -

[Defense Counsel]: Yeah. Credibility. If they are they were [sic] to swear under oath to something, are you more likely to believe it because they're a police officer?

[Juror 25]: Yes. I would say so, because the authority part of it. Yeah.

[Defense Counsel]: Nothing further, your Honor.

[The Court]: Mr. Zerby? [(The Commonwealth's Attorney)]

[Commonwealth's Attorney]: So really what we're getting at is this. Are you able to judge that police officer's testimony by the same standards that you would judge John Smith off the street and his testimony? Would you look at the two of them and use the same set of standards and the same issues to determine credibility as --

[Juror 25]: Yeah. Based off the facts or whatever you're talking about, yeah.

[Commonwealth's Attorney]: Okay. So just because an officer automatically takes the stand with a badge doesn't mean you're automatically writing down, this guy's telling the truth?

[Juror 25]: Right. Right. No.

Overby moved to strike Juror 25 for cause. The Commonwealth's Attorney responded that "[h]e's certainly rehabilitated himself and indicated he could judge and would judge all witnesses with the same standard." Overby's counsel replied, "Your Honor, while he believes he may be able to apply that, he clearly has an expectation about officers and their reliability, and that might not -- his belief in his impartiality may not be borne out, through no reason of his own, but it's still inappropriate for him to sit." The court denied the motion, saying, "Okay. I disagree. I'm going to allow him to stay. I think he was rehabilitated."

The attorneys also conducted individual voir dire of Juror 60. Juror 60 said "yes" when asked by defense counsel whether a testifying witness is "more believable or more likely to be telling the truth if they are a police officer." Defense counsel then asked whether Juror 60 understood that a police and non-police witness's "testimonies are to be given equal weight and

- 6 -

that it's inappropriate to presume an officer is more likely to tell the truth." Juror 60 replied, "Yeah. I was going to say I think I would still believe the officer. I know that only they're supposed to be equal, but witnesses a lot of times see things differently too, and officers are more trained as to what they see." The Commonwealth's Attorney then asked three rehabilitation questions to which Juror 60 responded "yes" or "yeah": Whether Juror 60 was "able to listen to the officer's testimony as well as all other witness testimony in the case and make a fair and impartial judgment after weighing credibility of all witnesses," whether she would wait to decide whether to convict until after she had "listen[ed] to the entire case," and whether she was "able to weigh the officer's testimony along with any civilian's testimony and make an independent decision after seeing all of their testimony and all of the witnesses . . . as to who is credible and who is not."

Overby's counsel also moved to strike Juror 60 for cause. The trial judge denied Overby's motion to strike, stating, "I believe she's been rehabilitated."

Neither Juror 25 nor Juror 60 sat on the jury that convicted Overby. Overby was forced to use a peremptory strike to prevent Juror 25 from serving on the jury panel. Overby was not forced to use a peremptory strike to remove Juror 60 from the panel.[5]

Overby timely noted his appeal.

---

[5] Over 60 prospective jurors were subject to voir dire questioning. Throughout the voir dire process, numerous prospective jurors were struck for cause, including 13 of the prospective jurors referred to by numbers between 1 and 37. After voir dire, the parties exercised 10 peremptory strikes—5 each—to reach a 12-person jury and 2 alternate jurors. The court and the parties determined that the 24-person panel on which the 10 peremptory strikes were exercised would consist of the prospective jurors numbered 37 and lower who had not been struck for cause. To reach this conclusion, the parties counted the prospective jurors who had not been struck for cause, ascending the list from number one. Juror 37 was the 24th remaining prospective juror on the list, the court and parties agreed, and, therefore, all prospective jurors numbered higher than 37 were "below the cut-off line" and would not be considered at the peremptory strike stage.

After peremptory strikes, Jurors 1, 2, 4, 11, 15, 16, 18, 19, 21, 28, 30, 32, 33, and 37 were selected to serve on the jury or as alternate jurors. Neither Juror 25 nor Juror 60 were selected to

ANALYSIS

## I.  Juror Impartiality

We will first address Overby's arguments regarding juror impartiality.  Overby argues

that the trial court erred by declining to strike Juror 60 and Juror 25 for cause.  For the reasons

stated below, we hold that the trial court committed no reversible error.

### A.  The Right to an Impartial Jury

Every person who is prosecuted for a criminal offense has "a fundamental right to a trial

by an impartial jury." *Scott v. Commonwealth*, 58 Va. App. 265, 270 (2011) (quoting *McGill v.*

*Commonwealth*, 10 Va. App. 237, 241 (1990)).  The right to an impartial jury is guaranteed by

the Sixth Amendment of the United States Constitution and Article I, § 8 of the Constitution of

Virginia.  This right has also been "reinforced by legislative mandate and by the Rules of this

court." *Castillo v. Commonwealth*, 70 Va. App. 394, 422 (2019) (quoting *Justus v.*

*Commonwealth*, 220 Va. 971, 975-76 (1980)).  "In Virginia, a defendant in a criminal case 'is

entitled to a panel of jurors free from exceptions *before* exercising peremptory challenges.'"

*Grimaldo v. Commonwealth*, 82 Va. App. 304, 316 (2024) (quoting *DeLeon v. Commonwealth*,

38 Va. App. 409, 412 (2002)).

Trial courts have a duty to ensure the protection of the right to an impartial jury.  *Scott*, 58

Va. App. at 270.  The primary method that trial courts employ to carry out this duty is voir dire.

*Mullis v. Commonwealth*, 3 Va. App. 564, 570 (1987).  "Any reasonable doubt as to a juror's

qualifications must be resolved in favor of the accused." *Grimaldo*, 82 Va. App. at 316 (quoting

*DeLeon*, 38 Va. App. at 412).  On the question of a juror's impartiality, "nothing should be left to

---

the jury or as alternate jurors.  Juror 25, not having been previously struck for cause, was among
the members of the jury panel eliminated by peremptory strike.  Juror 60, being numbered higher
than 37, was not among the 24 people who were either eliminated by peremptory strike or
selected to serve as jurors or as alternate jurors.

inference or doubt." *Northcraft v. Commonwealth*, 78 Va. App. 563, 587 (2023) (quoting *Bradbury v. Commonwealth*, 40 Va. App. 176, 180 (2003)).

Not every problematic statement that a prospective juror makes in voir dire will require a venireperson's disqualification. "Jurors 'cannot be expected invariably to express themselves carefully or even consistently.'" *Keepers v. Commonwealth*, 72 Va. App. 17, 47 (2020) (quoting *Garcia v. Commonwealth*, 60 Va. App. 262, 270 (2012)). "In a juror's responses to *voir dire*, '[t]he spectrum of opinion can range, by infinite shades and degrees, from a casual impression to a fixed and abiding conviction.'" *Id.* (alteration in original) (quoting *Briley v. Commonwealth*, 222 Va. 180, 185 (1981)). "The opinion entertained by a juror, which disqualifies him, is an opinion of that *fixed character* which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011) (quoting *Justus*, 220 Va. at 976). "Thus, 'the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.'" *Id.* (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000)).

When a venireperson initially expresses a bias or misperception, counsel will often ask questions in an attempt to allow the juror to rehabilitate him or herself, showing that he or she can "lay aside [his or her] preconceived views." *Id.* Genuine evidence of rehabilitation is required to overcome the prior misstatement. "[The] proof that [a prospective juror] is impartial and fair, should come from him and not be based on his mere assent to persuasive suggestions." *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976) (alterations in original) (quoting *Parsons v. Commonwealth*, 138 Va. 764, 773 (1924)). *See, e.g.*, *Northcraft*, 78 Va. App. at 590 (same); *Castillo*, 70 Va. App. at 423 (same); *Scott*, 58 Va. App. at 273 (same); *Bradbury*, 40 Va. App. at 181 (same). "Using or permitting the use of leading questions, those which suggest a desired

answer, in the *voir dire* of a prospective juror may taint the reliability of the juror's responses. Merely giving 'expected answers to leading questions' does not rehabilitate a prospective juror." *Griffin v. Commonwealth*, 19 Va. App. 619, 625 (1995) (quoting *McGill*, 10 Va. App. at 242). Rather, as we have said, proper rehabilitation involves (1) informing a juror of the correct legal principle and (2) allowing the juror to use his or her own words to reconcile it with the prior statement.

> Proper rehabilitation begins by instructing the potential juror on the correct principle of the law . . . . *Bradbury*, 40 Va. App. at 183. Once the potential juror acknowledges that he can apply this principle of law, the juror must then be allowed to reconcile it with his previous views. *Id.* "In this fashion, the juror could be rehabilitated using [his] own words to clarify [his] views rather than responding to the suggestions and influence of others." *Id.*

*Scott*, 58 Va. App. at 272-73 (second and third alterations in original).

When a trial judge involves him or herself in the rehabilitation of witnesses, this Court views voir dire with enhanced scrutiny due to a juror's natural "desire to say the right thing or to please the authoritative figure of the judge." *Id.* at 273 (internal quotation marks omitted) (quoting *McGill*, 10 Va. App. at 242). Rehabilitation can also be seriously undermined, however, by counsel's use of suggestive, leading questions. *See Scott*, 58 Va. App. at 273-74 (remanding for new trial where the evidence of a juror's rehabilitation came in response to counsel's leading questions); *DeLeon*, 38 Va. App. at 413 (same). *See also Pereira v. Commonwealth*, 83 Va. App. 431, 452-53 (2025) (trial court did not err by striking juror because evidence of juror's rehabilitation was prompted by defense counsel's leading questions).

A trial court's determination that there are reasonable doubts regarding a juror's impartiality is a factual finding entitled to appellate deference. *Lovos-Rivas*, 58 Va. App. at 61. Because the trial court "is able to see and hear each member of the venire respond to questions posed during *voir dire*, it is in a superior position" to evaluate jurors' responses on voir dire and

determine whether those responses will prevent the juror from serving impartially. *Id.* (internal quotation marks omitted) (quoting *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005)). *See also LeVasseur v. Commonwealth*, 225 Va. 564, 584 (1983) ("[T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror." (quoting *Smith v. Commonwealth*, 219 Va. 455, 464-65 (1978), *cert denied*, 441 U.S. 967 (1979))). This factual finding is entitled to our "great deference" unless "plainly wrong or unsupported by the record." *Harvey v. Commonwealth*, 76 Va. App. 436, 454 (2023) (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 121, 127 (2014)). A court's denial of a motion to strike a juror for cause "will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion." *Keepers*, 72 Va. App. at 43 (quoting *Townsend*, 270 Va. at 329-30).

A manifest error, however, will not be ignored. *Castillo*, 70 Va. App. at 423 ("Although we review the trial court's determination deferentially, 'any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused.'" (quoting *Breeden*, 217 Va. at 298)). "A manifest error occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion." *Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017). In reviewing the transcript of voir dire, this Court must consider the entirety of voir dire rather than viewing individual statements in isolation. *Keepers*, 72 Va. App. at 45.

### B. Overby's Argument

In this case, Overby argues that he was denied his right to an impartial jury because in overruling his motions to strike Jurors 25 and 60 for cause, the trial court failed to resolve reasonable doubts regarding the jurors' impartiality in his favor. Overby argues that the voir dire of both jurors demonstrated that the jurors believed that "police officers [are] necessarily more credible than other witnesses." The Commonwealth does not dispute that Jurors 25 and 60

- 11 -

initially expressed the belief that police officers are more credible or believable witnesses by virtue of their status as police officers. But the Commonwealth argues that, viewed in its totality, the voir dire indicates that Juror 25 and 60's views "were not so rigid or so prejudicial to Overby as to require the trial court to strike Jurors 25 and 60 for cause."

"A defendant cannot be fairly tried by a juror who would be inclined to give unqualified credence to a law enforcement officer simply because he is an officer." *Mullis*, 3 Va. App. at 571. Pursuant to this principle, a juror who believes that police officers are inherently more credible witnesses than other witnesses must be disqualified. *See Gosling v. Commonwealth*, 7 Va. App. 642, 644 (1989) (reversing conviction where a juror repeatedly stated "that he would tend to believe a correctional officer and to disbelieve witnesses that were inmates" because he believed that the officer lacked any incentive to lie, whereas inmates were incentivized to lie); *Taylor v. Commonwealth*, 61 Va. App. 13, 26, 28-29 (2012) (reversing conviction where a juror's stated beliefs "start[ed] with the premise that he would believe a police officer over another witness").

A juror need not be struck simply because he or she believes that a police officer's "training and experience in observing and recounting events *might* make the officer's account more accurate than that of an ordinary witness." *O'Dell v. Commonwealth*, 234 Va. 672, 694 (1988) (emphasis added). *See also Stewart v. Commonwealth*, 245 Va. 222, 235 (1993) (affirming conviction where juror stated that while she would believe an officer's testimony "in most cases," she later added, "you have to weigh both options, observe whatever it is you get from those persons"); *Mullis*, 3 Va. App. at 571-72 (affirming conviction where jurors' response to a single question on voir dire indicated "[a]t most" that they "would probably or would have a tendency to give *some* weight to the fact that a witness was a police officer in resolving credibility issues if all else were equal" (emphasis added)). The relevance of police officer

- 12 -

credibility to the case at bar should also be considered before reversing for a juror's pro-police bias. *See Mullis*, 3 Va. App. at 572 (citing the minimal impact that credibility issues could have played in the jury's decision as a factor supporting affirmance); *Gosling*, 7 Va. App. at 645 (distinguishing *Mullis* in part because the two sides presented solely officer and inmate testimony as evidence). *But see Taylor*, 61 Va. App. at 22-29, 31 (reversing for juror's statements of pro-police bias without discussing the degree of impact of police testimony or credibility in the case).

Thus, in this case, if "the record shows that a prospective juror [could not] or [would] not lay aside his or her preconceived opinion" that police officers are inherently more credible than other witnesses, then declining to strike the juror constitutes manifest error, requiring reversal. *Taylor*, 67 Va. App. at 456. *See Gosling*, 7 Va. App. at 644; *Taylor*, 61 Va. App. at 28-29. This analysis requires, first, examining the answers that the juror gave before rehabilitative questioning and, second, reviewing the juror's answers in their totality, considering the juror's responses to rehabilitative questioning and the way in which the rehabilitative questions were asked. *See, e.g.*, *Gosling*, 7 Va. App. at 645-647 (reviewing a juror's voir dire in these two steps); *Scott*, 58 Va. App. at 271-74 (same).

### C. Juror 25

Overby was forced to remove Juror 25 with a peremptory strike. *See* n.5, *supra*. Therefore, to the extent to which the trial court erred in declining to strike Juror 25 for cause, that error would not be harmless. *See Grimaldo*, 82 Va. App. at 316. However, after reviewing the parties' arguments and the record, we disagree with Overby's arguments. We hold that the trial court's determination that no reasonable doubts existed as to Juror 25's impartiality was not plainly wrong or manifestly contrary to the record. *See Harvey*, 76 Va. App. at 454. And we hold that the denial of Overby's motion to strike Juror 25 for cause did not rise to the level of a

"manifest error amounting to an abuse of discretion." *Keepers*, 72 Va. App. at 43 (quoting *Townsend*, 270 Va. at 330).

Prior to the Commonwealth's rehabilitation questions, Juror 25's responses on *voir dire* conveyed a belief in police officers' inherent credibility that required rehabilitation. First, Juror 25 responded affirmatively when the entire venire was asked whether police officers are less likely to lie under oath, less likely to fabricate testimony, or are imbued with additional credibility. On individual voir dire, after initially demurring, Juror 25 confirmed that he would indeed be "more likely to believe" a witness testifying under oath "because they're a police officer." Juror 25 said, "Yes. I would say so, because the authority part of it. Yeah." We first note that these statements do not indicate a deeply adamant or insistent view. *See Briley*, 222 Va. at 185 (discussing the potential range in jurors' beliefs). *See also Keepers*, 72 Va. App. at 45 (presuming that nuances in the juror's tone supported the trial court's interpretation); *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994) (same). Nonetheless, Juror 25's statements unambiguously conveyed a belief that a police officer's inherent authority makes police officers more credible than other witnesses. *See Gosling*, 7 Va. App. at 644; *Taylor*, 61 Va. App. at 26. A juror who serves while adhering to this principle would deny a defendant a fair trial. These statements thus required the juror's disqualification unless sufficient evidence of rehabilitation showed that the juror was able and willing to set this belief aside. *See Scott*, 58 Va. App. at 272 ("At this point, [the juror] should have been precluded from serving on the jury unless he was properly rehabilitated.")

The Commonwealth's Attorney's attempt at rehabilitation began with an instruction to Juror 25 on the relevant legal principles. *See id.* at 272-73. The Commonwealth's Attorney's questions explained that what the voir dire was "really . . . getting at" is that to be eligible to serve, the juror would have to be able to "judge [a] police officer's testimony by the same

standards that you would judge John Smith off the street and his testimony" and to "use the same set of standards and the same issues to determine credibility" of an officer and non-officer. This instruction appropriately gave the juror the opportunity to confirm that he could apply the correct principles of law that his initial statement had indicated he would not apply. *See Scott*, 58 Va. App. at 272-73. *See also Sizemore v. Commonwealth*, 11 Va. App. 208, 213-14 (1990) (reversing a conviction where, by contrast, rehabilitative questioning did not supply prospective jurors with the precise legal principle that they had initially disclaimed). In response, Juror 25 confirmed that he would apply the correct legal principles to the case, interjecting, "Yeah. Based off the facts or whatever you're talking about, yeah." The beginning of Juror 25's statement, "Yeah," constituted a confirmation that he could apply the correct principle of law. *See Scott*, 58 Va. App. at 272-73.

Finally, we must consider whether the record of the voir dire provides credible evidence that Juror 25 managed to "reconcile" the correct principle of law with his previous bias in his "own words," as required by *Scott*, 58 Va. App. at 273, as opposed to "[m]erely giving [an] 'expected answer[] to [a] leading question[],'" and whether that statement provided sufficient evidence of rehabilitation to permit the trial court to conclude that he had been rehabilitated. *Griffin*, 19 Va. App. at 625 (quoting *McGill*, 10 Va. App. at 242). We hold that, viewed in the light most favorable to the Commonwealth, the prevailing party below, the record contains enough rehabilitation evidence to require our deference pursuant to the "plainly wrong" standard.

First, in stating that he would judge the case "based off the facts," Juror 25 made a statement in his own words that conveyed that he was capable of following the correct principles of law stated by the Commonwealth's Attorney. We consider it important that the record does not indicate that Juror 25 was supplied with the phrase "based off the facts" by the Commonwealth's questions. Also importantly, judging the case "based off the facts" is a correct

statement of the analysis that the juror was required to perform, as contrasted with the inappropriate mode of analysis suggested by the juror's initial response—"based off" a presumption of enhanced police credibility. The Commonwealth's two introductory questions were not free from suggestion regarding the appropriate or expected answer, thus decreasing the relevant probative value of any response. *See Scott*, 58 Va. App. at 272-73; *Taylor*, 61 Va. App. at 25 n.3. But the juror's interjection of an appropriate response, framed in his own words—as opposed to a simple "yes" statement or repetition of the words used by the Commonwealth—provided evidence of rehabilitation that the trial court was entitled to consider. *See Scott*, 58 Va. App. at 273.

Second, the Juror's reference to "whatever you're talking about" could be interpreted in multiple ways, particularly given our inability to discern the witness's demeanor or tone. However, this Court assumes, when reasonable, that nuances in inflection and tone—undetectable in pages of a transcript—support the trial court's determination. *See Keepers*, 72 Va. App. at 45. *See also Taylor*, 67 Va. App. at 458 (noting the trial court's superior vantage point in judging the "inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror" (quoting *LeVasseur*, 225 Va. at 584)). Therefore, in the absence of evidence to the contrary, we presume that while saying "whatever you're talking about," the juror exhibited a serious tone and demeanor and that this phrase was thus a reference to his willingness to rely on the facts and the arguments made by the attorneys.

Finally, we must note that Juror 25's final statement, "Right. Right. No," supplied negligible evidence of rehabilitation because it was no more than an expected answer to a leading question. *See Griffin*, 19 Va. App. at 625. Therefore, the probative evidence that the trial court could consider in determining whether Juror 25 had reconciled the competing principles consisted only of the juror's first response to the Commonwealth's questions.

On balance, we hold that the evidence of rehabilitation in this case was not so deficient as to make it plainly wrong or contrary to the record for the trial court to have found proof beyond a reasonable doubt of impartiality. The trial court had evidence before it that could have supported its conclusion that the juror, after initially stating an inappropriate assumption regarding enhanced police credibility, was willing to set that view aside and judge the case solely based on the facts and evidence before him. *See Lovos-Rivas*, 58 Va. App. at 61. The juror's initial statement, while requiring disqualification without evidence of rehabilitation, was not unambiguously "fixed," given the evidence of rehabilitation in the record. *See id.* Combined with the tentative nature of Juror 25's initial statement of bias, the fact that Juror 25 subsequently stated a willingness to set aside his views in his own words enabled the trial court to reach a finding of impartiality that was not plainly wrong or contrary to the record. *See Harvey*, 76 Va. App. at 454. We hold that the trial court did not commit a manifest error constituting an abuse of discretion in declining to strike Juror 25 for cause. *See Keepers*, 72 Va. App. at 43.

### D. Juror 60

Juror 60 was not selected to serve on the jury that convicted Overby. Nor was Overby forced to use a peremptory strike to remove Juror 60 from the jury panel.[6] Therefore, Juror 60's views on police officer credibility cannot have subjected Overby to any prejudice in his trial. Thus, assuming without deciding that the trial court erred in declining to strike Juror 60 for

---

[6] On brief, both Overby and the Commonwealth state that Overby was forced to use a peremptory strike to remove Juror 60 from the jury panel. A review of the record, including the pages that both parties cite for this proposition, clearly disproves this assertion. *See* n.5, *supra*.

We will not adopt the parties' manifestly incorrect view of the record simply because it has been stated in both of their briefs. This Court has a duty to review the law, the parties' briefs, and the record, and to make decisions that reflect a faithful application of the law to the facts. This duty remains when a party, whether the Commonwealth or a defendant, attempts to concede a fact that is directly contradicted by the record. *See Turay v. Commonwealth*, 79 Va. App. 286, 314 n.23 (2023) (en banc) (Chaney, J., dissenting) ("[T]his Court is not required to accept concessions of fact that are demonstrably contrary to the evidence." (citing *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 293 (2022))).

cause, we hold that any such error was harmless. *See* Code § 8.01-678 ("When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any error committed on the trial."); *Ginevan v. Commonwealth*, 83 Va. App. 1, 20 n.14 (2024) ("The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." (quoting *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020))).

## II. Sufficiency of the Evidence

Overby also argues that the trial court erred in denying Overby's motion to strike and motion to set aside the evidence for his second-degree murder and use of a firearm in commission of a felony charges. He argues that the Commonwealth's evidence "merely showed suspicious circumstances suggesting that Overby might have been the shooter but failed in fact to prove that [it] was" Overby who killed Chappell.

The Commonwealth first argues that Overby's sufficiency-of-the-evidence arguments were not preserved for appellate review, according to Rule 5A:18. The Commonwealth points out that Overby's counsel did not renew his motion to strike after the defense presented evidence and argues that his later motion to set aside the verdict was "conclusory" and therefore did not suffice to preserve his objections under Rule 5A:18. Overby points to his motion to set aside the verdict, but in the alternative, asks that this Court apply the ends of justice exception to consider his arguments. We hold that Overby failed to preserve his sufficiency-of-the-evidence arguments and that the application of the ends of justice exception would not be justified in these circumstances.

## A. Rule 5A:18

A defendant who does not renew a motion to strike after choosing to put on evidence ordinarily waives the issue of the sufficiency of the evidence pursuant to Rule 5A:18, in the

- 18 -

absence of an ends of justice or good cause exception. *Murillo-Rodriguez v. Commonwealth*, 279 Va. 64, 83 (2010). A motion to set aside the verdict can also preserve the issue of the sufficiency of the evidence. *Brown v. Commonwealth*, 8 Va. App. 474, 480 (1989). However, "making one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Kirby v. Commonwealth*, 63 Va. App. 665, 667 n.2 (2014) (citing *Clark v. Commonwealth*, 30 Va. App. 406, 411-12 (1999)).

In this case, Overby moved to strike after the Commonwealth presented their evidence. Overby then failed to renew his motion to strike after the defense presented evidence. *See Murillo-Rodriguez*, 279 Va. at 83. In stating his motion to set aside the verdict, Overby's counsel said, "It would be a motion to set aside the verdict as contrary to law and evidence. Based on the evidence that was seen today, we would ask the Court to set aside this verdict as contrary to the materials presented today." Because the only evidence presented that day was the testimony of Overby's witnesses, this objection may have sufficed to convey the position that the verdict was contrary to the testimony of those witnesses. However, assuming without deciding that the objection was sufficient to preserve that argument, Overby presents different arguments on appeal. Rather than emphasizing his defense witnesses' testimony, Overby's appellate arguments are solely about what he argues were weaknesses in the evidence presented by the Commonwealth. *See Kirby*, 63 Va. App. at 667 n.2. Therefore, Overby failed to preserve his arguments regarding the sufficiency of the Commonwealth's evidence under Rule 5A:18.

B. Ends of Justice

Under Rule 5A:18, this Court will review an unpreserved objection to "attain the ends of justice" or for "good cause shown." Overby argues that the ends of justice exception should apply in this case. We disagree.

The ends of justice exception permits this Court to review an appellant's arguments despite the lack of a contemporaneous objection below when "necessary to avoid a grave injustice or the denial of essential rights." *Rowe v. Commonwealth*, 277 Va. 495, 503 (2009) (quoting *Charles v. Commonwealth*, 270 Va. 14, 17 (2005)). Application of the ends of justice exception is appropriate only when an error is "clear, substantial, and material." *Brown v. Commonwealth*, 8 Va. App. 126, 132 (1989). In the criminal context, when an appellant challenges the sufficiency of the evidence, "[i]n examining a case for miscarriage of justice, we do not simply review the sufficiency of the evidence under the usual standard, but instead determine whether the record contains affirmative evidence of innocence or lack of a criminal offense." *Masika v. Commonwealth*, 63 Va. App. 330, 334 (2014).

In this case, we hold that declining to review Overby's challenge to the sufficiency of the evidence would not result in a miscarriage of justice. The Commonwealth presented strong circumstantial evidence of Overby's guilt. Among this evidence was a confession to the murder that was sent from an account that Overby admitted was his own and proof of Overby's subsequent proximity to the weapon that was used to kill Chappell. Though Overby, in his police interview, denied having sent the incriminating messages, it was within the province of the factfinder to consider and reject his statements. *See Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) ("The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017))). And while Overby presented alibi witness testimony that Overby was not present at the time of the offense, the factfinder was similarly free to disregard this testimony as not credible. *See id.* Therefore, we hold that the ends of justice exception is not applicable to this circumstance and decline to consider Overby's sufficiency-of-the-evidence assignment of error.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

*Affirmed.*